**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2718-12T2

STATE OF NEW JERSEY

IN THE INTEREST OF C.F.,

    A Juvenile.

**APPROVED FOR PUBLICATION**

**February 8, 2016**

**APPELLATE DIVISION**

_____

Submitted January 12, 2016 — Decided February 8, 2016

Before Judges Fisher, Rothstadt and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FJ-20-1450-12.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent C.F. (Frank Pugliese, Assistant Deputy Public Defender, of counsel and on the brief).

Grace H. Park, Acting Union County Prosecutor, attorney for respondent/cross-appellant State of New Jersey (Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

During the afternoon of March 15, 1976, police responded to a caller concerned about the welfare of L.T., a fifty-seven-year-old woman who lived alone in Westfield.  Police entered L.T.'s home and found her dead, hog-tied face down on a bed with

a broken bottle near her head and a venetian-blind cord wrapped around her neck. There were no signs of a forced entry or theft. An autopsy determined that L.T. sustained a stab wound to the neck and another that pierced her left lung; a vaginal swab produced evidence of intact spermatozoa. Further investigation generated no suspects and the case went cold.

But truth, as Francis Bacon said, is the daughter of time. In March 2010 — thirty-four years after the murder — Detective Vincent Byron, working on cold cases, submitted DNA gathered from the 1976 crime scene and the autopsy to a lab for testing; a match was found in C.F.'s DNA,[1] which was already on file.[2] In the ensuing investigation, police learned that, at the time of the murder, C.F. was a fifteen-year-old high school student living in a house in Westfield that abutted L.T.'s backyard.[3]

---

[1] The State's DNA expert testified there was a one in 40,000,000,000,000,000 chance and a one in 450,000,000 chance, respectively, that the DNA found in L.T.'s underwear and the DNA on the vaginal swab obtained during the autopsy belonged to an African-American other than C.F.

[2] C.F. was an inmate in New Jersey's prison system from 1981 to 1997.

[3] The judge heard testimony that C.F.'s backdoor was approximately thirty yards from L.T.'s backdoor. A friend of L.T.'s testified that L.T. tended to keep the backdoor unlocked, a fact, as the judge observed, to which C.F. may have been privy.

A-2718-12T2

Although he was forty-nine years old, C.F. was charged in April 2012 in a juvenile delinquency complaint, which alleged he engaged in conduct in 1976 which, if committed by an adult, would constitute felony murder, N.J.S.A. 2A:113-1.[4] C.F. unsuccessfully moved to dismiss the complaint on due process and laches grounds. At the conclusion of a four-day bench trial, during which the State presented fifteen witnesses,[5] Judge Robert A. Kirsch found that C.F. committed felony murder.[6]

On January 31, 2013, the judge considered the parties' disagreement about the sentencing laws to be applied. The State argued the judge was required to apply the law in effect at the time of the offense, N.J.S.A. 2A:4-61(h), which authorized an indeterminate life sentence; C.F. sought application of the current law, in effect when he was tried and sentenced, N.J.S.A. 2A:4A(d)(1)(b), which authorized a maximum of ten years incarceration. The judge agreed with C.F., for reasons set forth in a comprehensive written decision, and imposed a ten-year period of incarceration.

---

[4] By the time of the complaint, a charge of sexual assault would have been time-barred. N.J.S.A. 2A:159-2.

[5] C.F. neither testified nor called any experts or other witnesses.

[6] The judge filed thorough and well-reasoned written opinions explaining his reasons for denying the motion to dismiss and in finding C.F. guilty.

Both C.F. and the State appeal. The State reprises its argument that C.F. should have been sentenced pursuant to the law in effect at the time of the offense and, because the judge applied current law, the term of incarceration imposed was not legal. C.F. argues, in a single point:

> DEFENDANT WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO OBJECT TO THE ADMISSION OF A NON-TESTIFYING MEDICAL EXAMINER'S AUTOPSY FINDINGS, THROUGH THE TESTIMONY OF ANOTHER MEDICAL EXAMINER, AS SUCH VIOLATED DEFENDANT'S RIGHTS TO CONFRONT WITNESSES, DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10 (Not Raised Below).

We reject the State's argument and do not reach the merits of C.F.'s ineffectiveness argument.

I

Turning first to C.F.'s appeal, we initially observe that the record on appeal does not disclose why counsel failed to assert an objection, based on the Sixth Amendment's Confrontation Clause, to testimony about the autopsy findings that came from a witness who did not perform the autopsy. To understand the significance of the argument, we observe that C.F.'s theory at trial was that the proofs did not demonstrate beyond a reasonable doubt that sex with L.T. was anything but consensual and that the fatal wounds were made later by another,

unidentified person.[7] The persuasiveness of C.F.'s theory is greatly affected — as the trial judge's findings reveal — by evidence about the lapse of time between the sexual encounter and L.T.'s murder.

In other words, C.F.'s confrontation argument presents a very fine point. The so-called "substitute witness" was permitted to opine about the evidence, including the autopsy photographs, the victim's clothing and the report prepared by another medical examiner, and the substitute witness was also permitted to explain that death was caused by a stab wound to the chest and asphyxiation by strangulation. Those opinions were not necessarily in conflict with C.F.'s third-party-guilt theory and we discern no prejudice to C.F. from the substitute witness's opinions on those points. The State's witness, however, also testified the sexual activity occurred between twenty-four and thirty-six hours prior to the commencement of the autopsy. Because the autopsy began at or around 11:15 a.m., on Tuesday, March 16, 1976, the judge extrapolated that the time of death was "between, approximately 11:00 p.m., on Sunday,

_____

[7] This theory was certainly colorable. An expert called by the State examined eight fingerprints taken from the crime scene. Four lacked sufficient detail to make feasible a comparison of others, and one belonged to L.T.; the remaining three did not match C.F. or anyone else known to police. In addition, DNA that matched neither C.F. nor L.T. was obtained from cigarette butts in an ashtray at the crime scene.

March 14 [and] approximately 11:00 a.m., Monday, on March 15, 1976"; the judge noted "the defense did not contest" this and that evidence regarding L.T.'s activities Sunday morning supported this assertion.

As the judge thoroughly explained in his well-reasoned written opinion, to prove felony murder the State was required to prove beyond a reasonable doubt that "[t]he fatal wounding of the decedent occurred sometime within the course of the [predicate offense, i.e., the sexual assault], including its aftermaths of escape and concealment efforts." By excluding the possibility that the sexual encounter occurred on Sunday — because of L.T.'s known activities for a part of Sunday, as well as testimony from the DNA expert about the "short shelf life of intact spermatozoa in live persons"[8] — the judge concluded that the sexual event happened at or about the time of death. The judge also relied on other evidence he found credible — including evidence demonstrating L.T. was tied up <u>after</u> the rape but stabbed in the chest <u>before</u> being tied-up — and made the following findings regarding the sequence of events:

---

[8] In paraphrasing the State's unrebutted expert testimony, the judge observed that "intact sperm in a live person remains visible only within six (6) hours after the sexual event, and no more than twenty-four (24) hours."

L.T. was stabbed in the chest, then her clothes were removed,[9] a robe was put on and her panties remained, the sexual event occurred, presumably in the bed, and thereafter she was tied and bound, and ultimately died from the stabbing wounds and asphyxiation. As a result of the sum of the testimony on the timing and sequence of the sexual event and the fatal stabbing and strangulation, the court concludes beyond any reasonable doubt that L.T. was "fatally wounded" during the commission of the rape.

The judge found no logical basis in the defense theory that "a purported consensual sexual event happened a day or more before the physical attack and death, and was thus separate and distinct from it" because

of the testimony regarding the short-lived visibility of intact sperm. . . . [The defense theory] would require L.T. or her assailant, after the stabbing and removal of her blouse, bra and slip, to place back on her the very panties and robe which coincidentally and unluckily contained [C.F.'s] innocently deposited sperm. Such a version strains the bounds of credulity well beyond the point of rupture.

---

[9] The judge drew this conclusion because of evidence that an area rug at the foot of a dresser was blood-stained, "indicating [L.T.] was out of the bed and injured at some point before she was bound, tied, and bedridden. In addition, the bottom of her right foot was caked in blood, with substantial splattering up to the ankle, strongly suggesting that, at some point prior to her found state in the bed, she was standing, with her foot firmly and presumably in her own blood." The judge also noted that a blouse found on the dresser had a "visible hole pierced through it, on its left side, which clearly correlates to the puncture wound visible on L.T.'s upper left chest[,] . . . demonstrat[ing] [she] was wearing this blouse when stabbed, and that it was removed thereafter."

There seems little doubt that in accepting the State's theory that the murder occurred simultaneously with or very close in time to the rape, the judge relied in part on the "substitute" witness's testimony.

In this light we examine C.F.'s argument that the Confrontation Clause barred this substitute witness from opining on subjects critical to the defense theory of third-party guilt and that counsel's failure to object was so detrimental that it warrants a new trial. Placing this assertion in the context of the ineffectiveness standard, C.F. was required to demonstrate the failure to object was "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687, 694, 104 S. Ct. 2052, 2064, 2068, 80 L. Ed. 2d 674, 693, 698 (1984); see State v. O'Neil, 219 N.J. 598, 611 (2014).

This argument was not presented to the trial judge in any fashion and the record does not reveal or suggest counsel's reason for not objecting to the substitute medical examiner's testimony. We cannot know, for example, whether there was a legitimate tactical reason for counsel's silence — that

A-2718-12T2

information "lie[s] outside the trial record" — and we, therefore, cannot reach the merits of C.F.'s ineffectiveness argument. State v. Preciose, 129 N.J. 451, 460 (1992).

Even assuming the decision to refrain from objecting could not advance some sound tactical goal favorable to the defense, we still would not be able to appreciate the impact of the second Strickland prong in light of the record's limitations. A full and fair consideration of C.F.'s confrontation arguments should first be explored by the trial judge, whose careful and painstaking review of the evidence was thoroughly explained in his written opinion. Because of his familiarity with the evidence, the trial judge will be in a far better position to appreciate whether there was a reasonable probability of a different outcome once he is presented with a post-conviction relief petition containing a specific analysis of the testimony C.F. believes was barred by the Confrontation Clause.[10]

For these reasons, we do not further consider whether C.F. was deprived the effective assistance of counsel; that question

---

[10] We emphasize C.F.'s need to be specific in future proceedings because of the uncertain lines the Supreme Court of the United States has drawn in this setting. See State v. Michaels, 219 N.J. 1, 15-36 (2014) (reviewing the evolution of the Supreme Court's Confrontation Clause jurisprudence from the landmark decision in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) to its members' splintered views in Williams v. Illinois, 567 U.S. __, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012)).

may be explored by way of a petition for post-conviction relief. Preciose, supra, 129 N.J. at 460.

                              II

In its appeal, the State contends that the judge imposed an illegal sentence by applying the law in effect at the time of sentencing instead of the law in effect when the offense occurred. We reject that argument.

When L.T. was murdered in 1976, the Legislature provided, by way of N.J.S.A. 2A:4-61(h), that "any time an adjudication of juvenile delinquency is predicated upon an offense which, if committed by [an adult] would constitute any form of homicide as defined . . ., then the period of confinement shall be indeterminate and shall continue until the appropriate paroling authority determines that such person should be paroled; and, except that in any case the period of confinement and parole shall not exceed the maximum provided by law for such offense if committed by [an adult]," i.e., a maximum of life in prison.[11] On

_____

[11] In 1976, the law called for every adult convicted of first-degree murder to "suffer death unless the jury shall by its verdict . . . recommend life imprisonment, in which case this and no greater punishment shall be imposed." N.J.S.A. 2A:113-4. In 1986, the imposition of a death sentence on a juvenile was barred by legislation, N.J.S.A. 2C:11-3(g), and later found constitutionally barred, Roper v. Simmons, 543 U.S. 551, 578, 125 S. Ct. 1183, 1200, 161 L. Ed. 2d 1, 28 (2005); State v. Bey, 112 N.J. 45, 104-05 (1988). And see Miller v. Alabama, 567 U.S.
                                            (continued)

the other hand, C.F. argued — and the trial judge agreed — that the disposition of this juvenile matter was to be governed by the sentencing laws in effect at the time of sentencing. N.J.S.A. 2A:4A-44(d)(1)(b) — enacted in 1982 to become effective December 31, 1983, L. 1982, c. 77, § 25, and still in effect — declares the court shall commit a juvenile found to have committed felony murder to a term "not to exceed . . . 10 years."

The State argued in the trial court — and argues now — that the judge should have looked back and applied a law the Legislature has since discarded because, as a general matter, "[c]riminal legislation is presumed to have prospective effect," and because the Legislature, by way of its "savings statute," has prohibited the retroactive application of a statutory

---

(continued)
__, __, 132 S. Ct. 2455, 2460, 183 L. Ed. 2d 407, 414-15 (2012) (holding the Eighth Amendment bars imposition of a mandatory life without parole sentence on offenders under the age of eighteen at the time of their offenses); see also Montgomery v. Louisiana, No. 14-280, 2016 U.S. LEXIS 862 at *34 (Jan. 25, 2016) (holding Miller's substantive rule of constitutional law applies retroactively). Consequently, the maximum sentence for a juvenile prior to the enactment of N.J.S.A. 2A:4A-44(d)(1), was a life sentence.

amendment reducing a criminal penalty[12] unless otherwise declared; this savings statute declares:

> No offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred, previous to the time of the repeal or alteration of any act or part of any act, . . . shall be discharged, released or affected by the repeal or alteration of the statute under which such offense, liability, penalty or forfeiture was incurred, unless it is expressly declared in the act by which such repeal or alteration is effectuated, that an offense, liability, penalty or forfeiture already committed or incurred shall be thereby discharged, released or affected.
>
> [N.J.S.A. 1:1-15.]

On its surface, this savings statute does not clearly reveal "the precise circumstances that trigger" its application. State v. Chambers, 377 N.J. Super. 365, 372-73 (App. Div. 2005).[13] Instead, the statute lumps together multiple concepts which do not occur simultaneously.

That is, the savings statute was designed to prevent a new law — absent an express declaration when the new law is enacted

---

[12] The ex post facto clauses in both the federal and state constitutions, U.S. Const. art. I, § 10; N.J. Const. art. IV, § 7, ¶ 3, prohibit application of a new law authorizing a more severe penalty for a prior offense. See State v. Witt, 223 N.J. 409 (2015).

[13] Congress and most state legislatures have enacted similar provisions but courts have not applied them uniformly. Id. at 373.

— from "discharg[ing], releas[ing] or affect[ing]" the application of an existing law, but it contains different triggering events for different occurrences. N.J.S.A. 1:1-15. By the statute's own terms, "offense[s]" are "committed" and "penalt[ies]" are "incurred." Ibid. Consequently, we look to the date an offense was committed in determining whether a new law, which discharges, releases or affects an offense, should be applied to that offense, but we look to the date a penalty was incurred to determine whether a new law should discharge, release or affect the penalty for the offense.

For example, in considering how the statute applies to an "offense," a subsequent change in the law defining felony murder would not govern this case absent a legislative declaration to that effect; in that circumstance, the argument in favor of applying the new law would actually seek its retroactive application. But a legislative change in the "penalty" for committing an offense — even if the offense was committed prior to the change — would not be hampered by the savings statute because, in that instance, the new law would be given prospective application; in that circumstance, we would look to the part of the savings statute that applies to "penalties," not "offenses," and observe that the statute declares no penalty "incurred . . . shall be . . . affected by the repeal or

alteration of the statute under which such . . . penalty . . . was _incurred_." N.J.S.A. 1:1-15 (emphasis added). In reading the statute this way, as we believe we must, the new sentencing law cannot be said to have been applied retroactively here because the new law, N.J.S.A. 2A:4A-44, was enacted _before_ C.F. _incurred_ a penalty. _Accord_ _State v. Parks_, 192 _N.J._ 483, 488 (2007).[14]

To be sure, a large gulf in time passed between the offense's commission and a penalty's incurrence; C.F. "committed" his offense in 1976 but did not "incur" a penalty until 2013. No matter how striking or unusual that circumstance may seem, it does not call for a different application of the savings statute than warranted by its express language. Put into the present context, had the Legislature redefined what it meant to "commit" felony murder after 1976, the savings statute would bar application of the new law. Our focus, however, is not on the elements of the offense but on the penalty to be imposed. C.F. did not incur a "penalty" until well after 1983, when the current juvenile sentencing laws took effect; the savings statute simply has no impact on the application of those new

---

[14] In _Chambers_, we considered the application of an amendment to the drunk driving statutes that, like here, called for a less severe penalty than before. _Id._ at 367. We held that the defendant was not entitled to the benefit of the new law not because it was enacted _after_ the offense but because, unlike here, it was enacted _after_ defendant was sentenced in municipal court. _Id._ at 372.

laws to him in 2013 because, in this sense, the new law is being applied prospectively, not retroactively.[15]

This same conclusion must be drawn when considering that punishment for criminal offenses is based not only on the need to confine an offender for the protection of society, but also to deter future criminal conduct and to rehabilitate the offender. These concerns are not necessarily served by imposing a penalty society no longer deems proper. In this sense, it has been recognized that an "ameliorative" statute "may be applied retroactively." In re Smigelski, 30 N.J. 513, 527 (1959); see also Gibbons v. Gibbons, 86 N.J. 515, 523 (1981). In similar circumstances, Judge Stanley Fuld recognized, in speaking for New York's highest court, that a refusal to apply a newer, ameliorative law serves only a vengeful purpose that does no honor to an enlightened society:

> A legislative mitigation of the penalty for
> a particular crime represents a legislative
> judgment that the lesser penalty or the
> different treatment is sufficient to meet

---

[15] State v. Parolin, 171 N.J. 223 (2002) is not inconsistent with our holding. Without reference to N.J.S.A. 1:1-15, the Court held that a version of the No Early Release Act enacted after the crime was inapplicable. There, however, as was the circumstance in Chambers, the new version of NERA was enacted not only after the offense but, more importantly, after that defendant was sentenced. It is in that context that the Court invoked "the presumption," upon which the State chiefly relies, "that criminal legislation is to have prospective effect." Parolin, supra, 171 N.J. at 233.

the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance. As to mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts.

[People v. Oliver, 134 N.E.2d 197, 202 (N.Y. 1956).]

We agree that this presumption in favor of application of a subsequent ameliorative statute warrants our affirmance of Judge Kirsch's decision to apply the sentencing laws in effect at the time he incarcerated C.F., and not the harsher law on the books when the murder was committed.[16]

---

[16] Our criminal code, in fact, embodies this concept, declaring that in any case "pending on or initiated after" the code's effective date, "[t]he court, with the consent of the defendant, may impose sentence" under the new code's provisions. N.J.S.A. 2C:1-1(c)(2). There apparently is no corollary to this statute in our juvenile laws, but the Supreme Court has recognized the application of a broader notion of fundamental fairness in similar circumstances that would further support the conclusion we reach. See Bey, supra, 112 N.J. at 104-05 (applying the Legislature's abolishment of the death penalty for juvenile offenders, without reference to N.J.S.A. 1:1-15, even though the offense occurred before the legislative action because, among other things, "sound public policy and fundamental fairness dictate that defendant not be singled out to be the only juvenile ever executed or even eligible for execution under our current death penalty law"); State v. Biegenwald, 106 N.J. 13, 65-67 (1987) (holding N.J.S.A. 2C:1-1(c) "signifies generally a legislative intention to give the benefit of new laws, when
(continued)

Affirmed in all respects but with the understanding that C.F. may pursue his ineffectiveness argument by way of post-conviction relief petition.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

(continued)
possible, and where just, to those who are charged under old laws").