**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0392-15T3

STATE IN THE INTEREST OF
J.F.,

        A Juvenile.

_____

APPROVED FOR PUBLICATION

June 16, 2016

APPELLATE DIVISION

Argued March 2, 2016 — Decided June 16, 2016

Before Judges Fuentes, Koblitz and Gilson
(Judge Gilson concurring).

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Atlantic
County, Docket No. FJ-01-620-14.

Sevan Biramian, Assistant Prosecutor, argued
the cause for appellant State of New Jersey
(James P. McClain, Atlantic County
Prosecutor, attorney; Elliot J. Almanza,
Assistant Prosecutor, of counsel and on the
brief).

Robert Lougy, Acting Attorney General,
attorney for appellant State of New Jersey
(Sarah Lichter, Deputy Attorney General, on
the supplemental brief).

Janet A. Allegro, Designated Counsel, argued
the cause for respondent J.F. (Joseph E.
Krakora, Public Defender, attorney for
respondent; Ms. Allegro, of counsel and on
the brief).

    The opinion of the court was delivered by

KOBLITZ, J.A.D.

After leave was granted, the State appeals from the August 27, 2015 order of Judge Michael Blee denying the State's application, filed pursuant to N.J.S.A. 2A:4A-26 and Rule 5:22-2, to waive jurisdiction of J.F.[1] to adult court for certain offenses he allegedly committed when he was fourteen years old. Following an extensive hearing, Judge Blee found that J.F. had met his burden of proving the probability of his rehabilitation before age nineteen, and that the probability substantially outweighed the State's reasons for waiver. We affirm substantially for the reasons set forth in Judge Blee's August 13, 2015 written opinion. We also determine, after receiving supplemental briefs on the issue at our request, that the State's position is contrary to the intent of the Legislature's recent repeal and replacement of N.J.S.A. 2A:4A-26,[2] which excludes the possibility of waiver to adult court for all juveniles whose unlawful behavior occurred before their fifteenth birthday. N.J.S.A. 2A:4A-26.1(c)(1). We therefore also affirm on the alternate basis that the new statutory age requirement as applied retroactively precludes waiver of J.F.[3]

---

[1] We use initials to protect the confidentiality of the juveniles. R. 1:38-3(d)(5).

[2] See Act of Aug. 10, 2015, ch. 89, 2015 N.J. Laws 89; N.J.S.A. 2A:4A-26.1.

[3] It is a well-settled principle that a court may provide several bases in reaching its ultimate conclusion. See Massachusetts v.

(continued)

I.

On January 8, 2014, when J.F. was only fourteen years and eleven months old, he was involved in an incident in which he was alleged to have shot two victims under the age of eighteen. One victim, fifteen-year-old D.T., was shot in the leg and buttocks, and the other, thirteen-year-old A.M.S., was shot in the chest and died as a result of his wounds.

A juvenile complaint was filed against J.F., charging him with conduct that if he were an adult would constitute first-degree purposeful murder, N.J.S.A. 2C:11-3(a)(1), second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b),[4] and second-degree possession of a handgun for an unlawful purpose,

_____

(continued)
United States, 333 U.S. 611, 623, 68 S. Ct. 747, 754, 92 L. Ed. 968, 977 (1948) (where a case might have been decided on either one of two independent grounds, but was decided on the basis of both, the decision "rested as much upon the one determination as the other . . . [and] the adjudication is effective for both"); McLellan v. Miss. Power & Light Co., 545 F.2d 919, 925 n.21 (5th Cir. 1977) ("It has long been settled that all alternative rationales for a given result have precedential value."); DeVincenzo v. W. N.Y., 120 N.J.L. 541, 543 (Sup. Ct. 1938) (finding that alternative reasons provided in a prior decision were not dicta because "[t]hey were the views of the court embodying one of two reasons, both of which, obviously, were effective in bringing the court to its conclusion").
[4] The juvenile complaint erroneously categorizes the charge as a first-degree offense. Possession of a handgun, however, is a second-degree crime, N.J.S.A. 2C:39-5(b)(1), except when the person has a prior conviction for certain specified crimes, converting it to a first-degree crime. N.J.S.A. 2C:39-5(j).

N.J.S.A. 2C:39-4(a). Additional charges were later brought: conduct that if he were an adult would constitute first-degree knowing murder, N.J.S.A. 2C:11-3(a)(2); an additional count of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); nine counts of fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4); eight counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4; fourth-degree unlawful disposition of a firearm, N.J.S.A. 2C:39-9(d); fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1); and third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1).

The State moved, pursuant to N.J.S.A. 2A:4A-26 and Rule 5:22-2, for the involuntary waiver of jurisdiction of J.F. from the Family Part to the Law Division, Criminal Part. Judge Blee conducted a twelve-day waiver hearing.

Atlantic City Police Sergeant David Weiss testified to the following. J.F. was identified as the shooter by other juveniles who were present at the January 8, 2014 incident. Weiss learned that the victim, A.M.S., had been involved in a fight with J.F.'s cousin the day before the incident. The fight was recorded on a cell-phone camera, and posted to Facebook.[5]

---

[5] Facebook is a website whose self-described mission "is to give people the power to share and make the world more open and connected." About Facebook, Facebook, (continued)

A.M.S. had indicated that there would be retaliation for the fight, and another minor, C.G., also threatened to become involved in the fight. On the day of the shooting, C.G. went to the school with several others to fight J.F.'s cousin. When school let out, C.G. and the group began to walk from the school. C.G. then encountered J.F. riding a bicycle. C.G. punched J.F. four to five times in the face, ran away, and informed the group that J.F. had a gun. Shortly thereafter, C.G. and the group encountered J.F., who pulled out the gun and opened fire. The group then ran away until A.M.S. collapsed.

Sergeant Weiss stated that J.F. and his cousin were allied with the "Stanley Holmes Alliances," while the victims and their friends were associated with the "Back Maryland Alliances." Weiss also repeated comments by others alleging past criminal activity by J.F.

Atlantic City Police Sergeant Christopher Barber testified that certain photographs taken at Harborfields depicting J.F. and other residents had been sent from the institution and later posted online with gang verbiage written on them.[6] The State

---

(continued)
https://www.facebook.com/facebook/info/?tab=page_info (last visited Apr. 14, 2016).

[6] Harborfields is a juvenile detention center located in Egg Harbor. See Youth Detention — Harborfields, Atlantic County
(continued)

A-0392-15T3

offered these postings to demonstrate that J.F. was affiliated with a gang while he was in Harborfields. Barber also discussed several Twitter[7] postings that he alleged demonstrated J.F.'s gang involvement.

Frederick Wilson, an employee at Harborfields, testified that the staff did not open the outgoing mail from residents. Wilson described a point system which allowed the residents to purchase, among other things, photographs of themselves. Wilson testified that J.F. was one of the top two residents in earning points. Detective Lauren Laielli of the Atlantic County Sheriff's Office, testified that she spoke with a former resident of Harborfields, who advised her of gang feuds occurring there between the Stanley Holmes gang and the Back Maryland gang. She testified that she was told J.F. would shout gang references at her informant while they were both housed at Harborfields.

During the rehabilitation phase of the trial, J.F. first offered the testimony of R.A., J.F.'s aunt, who was a caseworker for the Division of Child Protection and Permanency. R.A.

_____

(continued)
Government, http://www.atlantic-county.org/public-safety/harborfields.asp (last visited Apr. 12, 2016).

[7] Twitter is self-described as "an information network made up of 140-character messages called Tweets." Getting Started With Twitter, Twitter, https://support.twitter.com/articles/215585 (last visited April 12, 2016).

testified that she was aware that J.F. was beaten up more than once by neighborhood residents. In one incident, J.F. was beat up and kicked in the head, and was taken to the hospital for treatment. R.A. testified that J.F. was always quiet and reserved, and that he was "never a bad child."

Rochelle Andress, a social worker who had worked at Harborfields since 1997, described the daily routine for residents at Harborfields, and also gave a description of the living arrangements and rehabilitative services. Andress testified that the Juvenile Justice Commission supervises Harborfields, and its overall goal is to "rehabilitate juveniles and help them reach their full potential." Andress described the different programs offered at Jamesburg[8] for juveniles, including certain vocational training, cognitive behavioral therapies and counseling. Regarding J.F., she stated:

> We don't have any problems with [J.F.]. He gets along well with others. He's compliant and respectful when he interacts with the staff. He participates in everything that we provide to him. Been pos[itive] most of the time that he's been there. Haven't had any problems with him at all I mean and he's been there for a year and generally in that amount of time behavior tend to rear their

---

[8] Jamesburg is also known as the New Jersey Training School, a juvenile detention center located in Monroe Township. See generally New Jersey Training School, Office of the Attorney General, http://www.nj.gov/oag/jjc/secure_njts.htm (last visited Apr. 12, 2016).

> ugly little head with kids and with him we just have not had that. He's been, you know, in my opinion a model resident.

Andress described the rating and point system utilized at Harborfields, stating that J.F. had positive ratings and responds well to the program. J.F. was a high "point earner." Andress explained that J.F. had earned enough points to have special visits, which allowed him extra time to see his family. J.F. and his mother speak regularly over the phone. According to Andress, J.F.'s mother was in the top one percent as far as parent involvement with J.F.

J.F. was also involved in a number of afterschool programs at Harborfields. Andress described the programs, in particular a program that sought to teach the residents about decision-making skills. J.F. elected to participate on his own, which was not typical of most residents. J.F. had been respectful throughout his stay and was in the top five percent of students at Harborfields in terms of behavior. Andress opined that J.F. had potential and had done well in the structured environment of Harborfields.

Andress also had been provided gang awareness training at Harborfields. She explained that Harborfields did not have a policy on separating juveniles based on gang affiliations. Andress had read the State's expert's report on J.F. that

mentioned a gang, but was unaware of J.F. having any gang affiliation until an investigator came to the school inquiring about photographs containing gang verbiage. Andress testified that it is likely that members of the Back Maryland gang attend classes at Harborfields with J.F., but there had been no incidents caused by their attendance together.

Shannon Rawson, J.F.'s eighth grade teacher, described an instance in 2012 when J.F. complained of being "jumped" by grown men. Rawson contacted J.F.'s mother to inform her of the incident. Another juvenile stated in class that he was going to shoot J.F. in the face, and have other juveniles come beat him up. Boys would frequently come to J.F.'s school to fight him or his younger brother. On another occasion, J.F. cried, complaining that other boys were fighting with him outside of the school. Rawson had not witnessed J.F. act as the aggressor; he often protected himself and his brother.

Rawson also witnessed A.M.S. fight with J.F.'s younger brother. The day of the shooting, Rawson saw a cell phone video depicting J.F. "riding up on a bike and this big, fat Spanish kid hitting him from behind and knocking him off the bike. And he's -- and then the gang of boys who were in the crowd jumped on him." Rawson explained that another boy approached J.F. from behind and punched him in the back of the head.

Dr. Ronald S. Gruen, a clinical psychologist, testified that he met with J.F. twice. On his first visit, J.F. was guarded and distrusting, but on his second visit he was more forthcoming. Dr. Gruen conducted a lengthy clinical interview followed by psychological testing. Dr. Gruen stated that J.F. expressed

> the fact that he was pursued and harassed and beaten up many times by this other gentleman that he subsequently shot. And that he had appealed to the authorities at Crawford School, he had told his mother. His mother had told the police and the school officials and nothing was really done in his opinion and he just couldn't stand it anymore. He could not stand constantly -- he said he felt paranoid, he had eyes in the back of his head when he would leave the school building. He was very unnerved, very nervous, upset and feeling he just had no way out.

Dr. Gruen believed J.F.'s claims of being threatened and beaten up were legitimate. J.F. denied being in a gang, although Dr. Gruen did not completely believe him. J.F.'s recitation of his poor treatment was consistent with J.F.'s eighth-grade teacher's account. J.F. was respectful in their interactions. Dr. Gruen stated:

> He really suffered from poor self-esteem and he felt obligated to protect his brother and he didn't feel he was doing a very good job of that either. And I think that, you know, this tormented him. And when you're a young adolescent like that, you want to be king of

> the hill. And I think he felt very small and very defenseless.

Dr. Gruen discussed how bullying might affect a fourteen-year-old high school student, stating that "desperate people do desperate things."

Dr. Gruen also testified that he met with J.F.'s mother, who appeared to care for J.F. deeply. Dr. Gruen testified that the mother-son bond is a strong factor in assessing rehabilitation potential. J.F.'s mother indicated that she made several attempts to end the bullying, having spoken with other parents and the authorities.

Dr. Gruen also spoke with Andress, who gave J.F. a strong endorsement. Dr. Gruen noted that in his other interactions with the administration at Harborfields, he generally did not get a positive response about the juveniles detained there.

Dr. Gruen stated that J.F.'s age was also a positive factor in terms of rehabilitation, noting that at fourteen years old, a child has not truly formed his personality, which could therefore be influenced in a positive direction. Dr. Gruen did not believe J.F. suffered from antisocial personality disorder despite some behavioral issues. Dr. Gruen believed J.F.'s drug involvement negatively impacted his rehabilitation, but he did not view this as a long-term issue. J.F. seemed relieved that he was at Harborfields and not on the street being bullied. The

A-0392-15T3

Family Court could offer the proper services for J.F. to continue on a path to rehabilitation. Jamesburg offered a "closed setting" where J.F. would be monitored, and he would benefit from the group and individual therapy, vocational training, and schooling. Dr. Gruen's ultimate conclusion was that J.F. could be rehabilitated by the age of nineteen.

In rebuttal, the State called Dr. Louis Schlesinger, a forensic psychologist. Dr. Schlesinger testified that he met with J.F. once and did not have any contact with J.F.'s mother. Dr. Schlesinger testified to J.F.'s family circumstances, noting that his mother had been a constant presence in J.F.'s life, but that J.F. had no contact with his biological father, who was imprisoned in a different state. Dr. Schlesinger conducted a battery of psychological tests. Dr. Schlesinger described J.F. as follows:

> He was pleasant, he was very pleasant. He was very cooperative. He was very polite. He worked carefully. He seemed to me to be motivated. He presented himself, to me, throughout -- initially as being bullied by a group of individuals, as a victim of being bullied. Eventually, I told him that I knew all the details of all this, and he became a little bit more forthcoming. He told me his background adequately. I thought he denied and minimized his involvement with youth gang activity, as well as his drug-selling behavior and drug use, as well. I challenged him at a few points, as I do with every individual, and he kept his composure. He was never disrespectful throughout, ever.

He was not hostile. He did become tearful when discussing his future.

His concentration was fine. I was with him for over five hours. His attention span and concentration were fine. There was nothing bizarre about him. He wasn't inappropriate in any way, and he was just very super-polite throughout.

Dr. Schlesinger stated that J.F. described a situation in which he was bullied, which led J.F. to protect himself and his younger brother by getting involved in the shooting. Dr. Schlesinger testified that J.F. denied knowledge of any gangs.

Dr. Schlesinger noted that although Dr. Gruen's report correctly stated that J.F. had no prior criminal record, he believed not being caught was different from not being involved in past criminal conduct. Dr. Schlesinger testified that J.F. had admitted using marijuana, and previously had used prescription drugs. He opined that J.F.'s inconsistent and untruthful answers to his interview questions were not a positive indicator for rehabilitation. Dr. Schlesinger also testified that J.F. had average to low-average intelligence, and demonstrated some personality deficiencies that could later lead to a personality disorder. Other tests evidenced that J.F. might be mildly depressed and have problems with impulses and inner anger. He stated J.F. appeared to suffer from a conduct disorder.

13                                                        A-0392-15T3

Dr. Schlesinger opined that J.F. had accepted responsibility for his actions relating to the shooting, but had not accepted responsibility for many other actions. Although J.F. had made a good institutional adjustment while at Harborfields, J.F.'s contact with gang members strongly influenced Dr. Schlesinger's opinion of J.F.'s probability for rehabilitation. Dr. Schlesinger opined that J.F.'s "mind is still in the street." Dr. Schlesinger concluded rehabilitation was "only remotely possible."

In his detailed forty-five-page written opinion, Judge Blee found, pursuant to N.J.S.A. 2A:26A-26, the State proved probable cause for the charge of first-degree murder, but that J.F. had demonstrated the probability of rehabilitation prior to age nineteen by use of the procedures, services, and facilities available to the court, substantially outweighed the reasons for waiver.

Judge Blee found J.F. had been bullied for two years prior to the incident and had no prior exposure to the juvenile justice system "in terms of charges, court-ordered services, or supervision." Judge Blee found significant evidence of social media interaction evidencing J.F.'s affiliation with a gang, but

noted that the State had not charged him with gang criminality.[9]
The judge stated J.F.'s gang involvement "was a significant
factor to consider in weighing the possibility of
rehabilitation." Judge Blee wrote:

> Due to J.F.'s young age and the strong
> possibility of lengthy incarceration, any
> gang affiliations the Juvenile has are
> likely to be severed by the time J.F. is
> released from custody. It is very likely
> that current gang members will be
> disassociated from the gang and living
> relatively normal lives, incarcerated or
> deceased. There is also the possibility
> that the present gangs will be dissolved at
> the time J.F. is released. The court notes
> that although there was evidence presented
> at the hearing demonstrating possible gang
> affiliations, the court must equally
> consider the fact that the Juvenile has not
> had exposure to the juvenile justice system
> in terms of charges, court-ordered services,
> or supervision prior to the incident.

The judge also considered J.F.'s post-incident conduct. J.F.
had been compliant and respectful during his time at
Harborfields, receiving positive reviews from supervisors.
Judge Blee was "disturbed with the communication from J.F. to
other alleged gang member[s]," but explained that these
individuals appeared to be J.F.'s only friends, and because he
was just beginning the rehabilitative process, some error in
judgment was to be expected.

---

[9] See N.J.S.A. 2C:33-29.

A-0392-15T3

Judge Blee also found the testimony of Sergeants Weiss and Barber to be "credible" and the testimony of social worker Andress and J.F.'s teacher Rawson to be "highly credible," noting that Andress's testimony had provided important information about J.F.'s behavior at Harborfields. Rawson's testimony regarding the background of J.F. as a student and the conflicts he faced "had the most significant impact on the court."

Judge Blee found Dr. Gruen's evaluation of J.F. was "thoughtful and comprehensive, and that his conclusions were credible and well-supported." Judge Blee found that Dr. Schlesinger testified credibly about J.F.'s ability to be rehabilitated, but found that Dr. Gruen's opinion was "more reasonable and persuasive."

Judge Blee found J.F. clearly presented a number of risk factors, "including an absent father, gang involvement, previous drug use, and defiance." He found that J.F. was thriving "in a structured, safe, organized, and closely monitored environment." Judge Blee concluded J.F. had demonstrated that there was a probability of rehabilitation before he turned nineteen.

Judge Blee then balanced the reasons for waiver against the prospects of rehabilitation. Judge Blee analyzed J.F.'s case pursuant to the five factors enunciated in State ex rel. C.A.H.,

89 N.J. 326 (1982). He found that the first and second factors, seriousness of the alleged offense and deliberate nature of the offense, militated in favor of waiver. The third factor, age of the offender, militated against waiver because J.F. was fourteen at the time of the offense. The fourth and fifth factors, history of prior infractions and prior exposure to the juvenile justice system, given J.F.'s prior drug use, but also considering that J.F. had no exposure to the juvenile justice system prior to the instant offense, militated against waiver. Judge Blee also considered other factors, such as the presumption of waiver in murder cases, the legislature's intent in adding judicial oversight of waiver cases for juveniles under sixteen, the need for deterrence balanced against J.F.'s age and the sentencing disparity for murder between juveniles and adults. Ultimately, Judge Blee determined that "J.F.'s strong and compelling prospects for rehabilitation substantially outweigh the standard of the attenuated argument of deterrence in this case."

## II.

On appeal, the State contends that the trial judge improperly found certain testimony favoring the juvenile more credible than appropriate and gave less weight to the State's evidence concerning the juvenile's gang ties than he should

have.  The State also argues that the trial judge erred in assessing the probability of J.F.'s rehabilitation.  We disagree.

Our standard of review in juvenile waiver cases "is whether the correct legal standard has been applied, whether inappropriate factors have been considered, and whether the exercise of discretion constituted a 'clear error of judgment' in all of the circumstances."  State v. R.G.D., 108 N.J. 1, 15 (1987) (quoting State v. Humphreys, 89 N.J. 4, 13 (1982)).  When reviewing these matters, it is required that "1) findings of fact be grounded in competent, reasonably credible evidence, 2) correct legal principles be applied, and 3) the judicial power to modify a trial court's exercise of discretion will be applied only when there is a clear error of judgment that shocks the judicial conscience."  State ex rel. A.D., 212 N.J. 200, 215 (2012) (quoting R.G.D., supra, 108 N.J. at 15).  Importantly, consideration should be given to the experience of the Family Court in adjudicating juvenile waiver cases:

> The common sense and experience of the Family Part must always be brought to bear on the ultimate question of rehabilitative potential.  For although the weight to be given to expert or other evidence bearing on the probability of rehabilitation properly is to be judged by such factors as the extent to which the witness may have tested the juvenile, the manner of testimony, or the interest of the witness, none can

> properly substitute for the court's ultimate responsibility to determine whether the statutory criteria have been met.
>
> [R.G.D., supra, 108 N.J. at 16 n.7.]

In his lengthy written opinion, Judge Blee applied the settled waiver law to the facts as he found them. As a Family Court judge, he has expertise in matters concerning juveniles, as did several of the witnesses who appeared before him, including the two experts, J.F.'s teacher and the social worker at Harborfields. We defer to Judge Blee's expertise, and affirm on the basis of his thorough opinion, which was based on the "competent, reasonably credible evidence." See A.D., supra, 212 N.J. at 215.

## III.

Judge Blee's August 13, 2015 opinion stated that he was not applying the recent legislation signed by the Governor on August 10, 2015, effective March 1, 2016, which repealed and replaced N.J.S.A. 2A:4A-26. See Act of Aug. 10, 2015, ch. 89, 2015 N.J. Laws 89. Under the revised waiver statute, a juvenile cannot be waived to the Law Division unless the State can establish that "the juvenile was 15 years of age or older at the time of the delinquent act." N.J.S.A. 2A:4A-26.1(c)(1). J.F. was fourteen years old at the time of the shooting. Thus, if the revised statute were applied, J.F. would not be subject to waiver.

The State argues in its supplemental brief that we should not apply the revised waiver statute in this case. The State contends that criminal statutes are generally presumed to have a prospective effect, and should not be applied to pending appellate cases.

As a general principle, in criminal as well as other statutes, "the law favors prospective, rather than retroactive, application of new legislation unless a recognized exception applies." Ardan v. Bd. of Review, ___ N.J. Super. ___ (2016) (slip op. at 10); State v. Parolin, 171 N.J. 223, 233 (2002). That presumption, however, "is no more than a rule of statutory interpretation." State v. Bey, 112 N.J. 45, 103 (1988) (quoting Rothman v. Rothman, 65 N.J. 219, 224 (1974)). "Courts must apply a two-part test to determine whether a statute should be applied retroactively: (1) whether the Legislature intended to give the statute retroactive application; and [if so] (2) whether retroactive application 'will result in either an unconstitutional interference with vested rights or a manifest injustice.'" Ardan v. Bd. of Review, supra, slip op. at 10 (quoting James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014)).

Under the first part of the test enunciated in James, the presumption against retroactivity "can be overcome by an

indication of contrary legislative intent, either expressed in the language of the statute itself, or implied in its purpose." See Bey, supra, 112 N.J. at 103. When an appellate court finds that retroactive legislative intent exists, it is well-established that the court must "apply the statute in effect at the time of its decision . . . to effectuate the current policy declared by the legislative body." Ibid. (quoting Kruvant v. Mayor & Council of Twp. of Cedar Grove, 82 N.J. 435, 440 (1980)).

Within the first part of the test, three exceptions to the general rule of prospective application are well-established: (1) when the Legislature intended retroactive application of the statute either expressly, as "stated in the language of the statute or in the pertinent legislative history," or implicitly, requiring retroactive application to "make the statute workable or to give it the most sensible interpretation"; (2) when the statute is "ameliorative or curative"; or (3) when the "expectations of the parties may warrant retroactive application." Gibbons v. Gibbons, 86 N.J. 515, 522-23 (1981). "Under the second exception to the general rule, the term 'ameliorative' refers only to criminal laws that effect a reduction in a criminal penalty." Street v. Universal Mar., 300 N.J. Super. 578, 582 (App. Div. 1997) (quoting Kendall v.

<u>Snedeker</u>, 219 <u>N.J. Super.</u> 283, 286 (App. Div. 1987)).  "The ameliorative exception first appeared in New Jersey in the case of <u>In re Smigelski</u>, 30 <u>N.J.</u> 513, 527 (1959), in which the Supreme Court held that a statutory amendment restricting a juvenile's possible exposure to commitment was ameliorative and thus could be applied retroactively."  <u>Kendall</u>, <u>supra</u>, 219 <u>N.J. Super.</u> at 286.  Our Supreme Court cited <u>People v. Oliver</u>, 151 <u>N.Y.S.</u>2d 367 (1956), a New York case, for this proposition. <u>Smigelski</u>, <u>supra</u>, 30 <u>N.J.</u> at 527.  <u>Oliver</u> states:

> [W]here an ameliorative statute takes the form of a reduction of punishment for a particular crime, the law is settled that the lesser penalty may be meted out in all cases decided after the effective date of the enactment, even though the underlying act may have been committed before that date.
>
> . . . A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.  Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance. As to a mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts.
>
> [<u>Oliver</u>, <u>supra</u>, 151 <u>N.Y.S.</u>2d at 373.]

22                                        A-0392-15T3

We note that "[e]very statutory amendment which ameliorates or mitigates a penalty for a crime is not automatically subject to a presumption of retroactivity. The ameliorative amendment must be aimed at mitigating a legislatively perceived undue severity in the existing criminal law." Kendall, supra, 219 N.J. Super. at 286 n.1.

The revised waiver statute was intended to ameliorate the punitive sentencing previously meted out to adolescent offenders after waiver. The legislative action was also intended to address the treatment needs of children.[10] The increase in the minimum waiver age is part of that emphasis on rehabilitation rather than punishment, a part of the effort to ensure that children do not become prey to adult inmates nor suffer the many societal consequences of an adult criminal record.[11] Among the changes in the revised waiver statute is the new post-waiver provision, requiring that a juvenile case be remanded to the Family Part for disposition if the juvenile is convicted of an

---

[10] See Reforms to the Juvenile Justice System: Committee Meeting on S. 2003 Before the S. Law & Pub. Safety Comm'n, 216th Leg., 2d Sess. (March 12, 2015) (statement of Sen. Nellie Pou); see also Michael Booth, Christie OKs Juvenile Justice Reforms, N.J.L.J. (Aug. 11, 2015), http://www.njlawjournal.com/id=1202734482923/Christie-OKs-Juvenile-Justice-Reforms?slreturn=20160319110141.
[11] See Reforms to the Juvenile Justice System: Committee Meeting on S. 2003 Before the S. Law & Pub. Safety Comm'n, 216th Leg., 2d Sess. (March 12, 2015) (statement of Sen. Nellie Pou).

offense that would not have initially rendered him or her eligible for waiver, <u>N.J.S.A.</u> 2A:4A-26.1(f)(2). The statute also for the first time provides a presumption that, if convicted after waiver, the juvenile will serve any custodial sentence imposed in a state juvenile facility until the age of twenty-one, and gives the Juvenile Justice Commission (JJC) the discretion to allow the individual, with his or her consent, to continue to serve the sentence in that facility even after turning twenty-one, <u>N.J.S.A.</u> 2A:4A-26.1(f)(1).[12]

Scientific knowledge regarding the limited biological development of the teenage mind has advanced[13] and society no

---

[12] We do not opine on the retroactivity of the other provisions in the revised waiver statute because they are not relevant to the issues before us.

[13] With improvements in magnetic resonance imaging technology, studies have shown that the frontal lobe, where decisions regarding judgment and risk-taking are made, does not fully develop in juveniles until their mid-twenties. <u>See</u> Michele Deitch et al., <u>From Time Out to Hard Time: Young Children in the Adult Criminal Justice System</u> 13-14 (2009), http://www.utexas.edu/lbj/archive/news/images/file/From%20Time%20Out%20to%20Hard%20Time-revised%20final.pdf (discussing the cognitive and psychological development of juveniles; specifically, frontal lobe development and its relation to decision-making in juveniles); <u>see also</u> <u>Graham v. Florida</u>, 560 <u>U.S.</u> 48, 68, 130 <u>S. Ct.</u> 2011, 2026, 176 <u>L. Ed.</u> 2d 825, 841 (2010) ("As compared to adults, juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender
(continued)

longer thinks of a fourteen-year-old as a fully developed individual who might be incapable of rehabilitation. Recent scientific research establishes that children under the age of fifteen will change through maturation. The Legislature, in raising the age requirement for waiver by one year, determined that children who commit offenses when under the age of fifteen should never be waived up to face adult penalties. This legislative determination to ameliorate an unduly harsh penalty for fourteen-year-old juveniles supports the retroactive application of the revised waiver statute. See Kendall, supra, 219 N.J. Super. at 286 n.1.

Finding that the revised age requirement of the statute should be applied retroactively to J.F. pursuant to the first part of the James test, we must next consider the second part of the two-part test. See Ardan v. Bd. of Review, supra, slip op. at 13. The State makes no argument that it would suffer an "unconstitutional interference with a vested right or a manifest injustice." See ibid. Retroactively applying the age requirement of the revised waiver statute would impose no

_____

(continued)
whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (alterations in original) (citations omitted) (quoting Roper v. Simmons, 543 U.S. 551, 569-70, 573, 125 S. Ct. 1183, 1195, 1197, 161 L. Ed. 2d 1, 22, 24 (2005))).

"unfairness [or] inequity".  See <u>Oberhand v. Dir., Div. of Taxation</u>, 193 <u>N.J.</u> 558, 572 (2008) (quoting <u>In re D.C.</u>, 146 <u>N.J.</u> 31, 58 (1996)).  Thus, the second part of the <u>James</u> test does not limit retroactive application of the revised waiver statute.

Were we to disagree with Judge Blee's findings and consider the extraordinary action urged by the State — waiving J.F. based on our review of the record without a remand — we would be constrained to "apply the statute in effect at the time of [our] decision" in accordance with the "current policy declared by the legislative body."  <u>Bey</u>, <u>supra</u>, 112 <u>N.J.</u> at 103 (quoting <u>Kruvant</u>, <u>supra</u>, 82 <u>N.J.</u> at 440).

Alternatively, were we to reverse Judge Blee's determination and remand for a new waiver hearing, the judge would apply the age requirement of the revised waiver statute, not only for the reasons expressed above, but also because the "savings statute" anticipates the utilization of more lenient sentencing provisions enacted prior to the imposition of the penalty.  Pursuant to <u>N.J.S.A.</u> 1:1-15:

> <u>No offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred</u>, previous to the time of the repeal or alteration of any act or part of any act, by the enactment of the Revised Statutes or by any act heretofore or hereafter enacted, shall be discharged, released or affected by the repeal or alteration of the statute under which such offense, liability, penalty or forfeiture

was incurred, <u>unless it is expressly declared in the act by which such repeal or alteration is effectuated, that an offense, liability, penalty or forfeiture already committed or incurred shall be thereby discharged, released or affected</u>; . . . .

[(Emphasis added).]

"[T]he savings statute was designed to prevent a new law — absent an express declaration when the new law is enacted — from 'discharg[ing], releas[ing] or affect[ing]' the application of an existing law, but it contains different triggering events for different occurrences." <u>State ex rel. C.F.</u>, 444 <u>N.J. Super.</u> 179, 188 (2016) (second, third, and fourth alterations in original) (quoting <u>N.J.S.A.</u> 1:1-15). The statute contains an important distinction, noting that "'offense[s]' are 'committed' and 'penalt[ies]' are 'incurred.'" <u>Ibid.</u> (alterations in original) (quoting <u>N.J.S.A.</u> 1:1-15). In evaluating retroactive application, we consider the "date an offense was <u>committed</u> in determining whether a new law, which discharges, releases or affects an offense, should be applied to that offense, but . . . look to the date a penalty was <u>incurred</u> to determine whether a new law should discharge, release or affect the penalty for the offense." <u>Id.</u> at 188-89.

In <u>C.F.</u>, we scrutinized whether a defendant, who was a juvenile at the time the offense was committed forty years ago, should be punished according to the current more lenient

A-0392-15T3

sentencing laws, calling for a maximum of ten years in prison, or the 1976 statute authorizing an indeterminate to life sentence:

> [P]unishment for criminal offenses is based not only on the need to confine an offender for the protection of society, but also to deter future criminal conduct and to rehabilitate the offender. These concerns are not necessarily served by imposing a penalty society no longer deems proper. In this sense, it has been recognized that an "ameliorative" statute "may be applied retroactively."
>
> [Id. at 190 (quoting Smigelski, supra, 30 N.J. at 527).]

For the very reasons expressed in C.F., the current age provision should be applied to a juvenile such as J.F. who, under the revised statute, would no longer face the possibility of waiver as a result of any offenses he committed as a fourteen-year-old. As we have previously outlined, a waiver to adult court is part of the extended process of determining the severity of the sentence that will be doled out after a determination that the juvenile has committed an offense.

Lastly, the State argues in its supplemental brief that the holding in C.F. is inapplicable because a juvenile waiver statute does not deal with penalties, but, rather, is merely a

procedural mechanism.[14]   The State's argument that the revised waiver statute is procedural squarely contradicts their insistence on adherence to the prior waiver statute.   As stated in N.J.S.A. 1:1-15:

> [W]hen the Revised Statutes, or other act by which such repeal or alteration is effectuated, shall relate to mere matters of practice or mode of procedure, the proceedings had thereafter on the indictment or in the prosecution for such offenses, liabilities, penalties or forfeitures shall be in such respects, as far as is practicable, in accordance with the provisions of the Revised Statutes or such subsequent act.
>
> [(Emphasis added).]

Thus, were we to accept the State's argument that the statute is procedural and also determine that a new hearing was warranted, the revised waiver statute would control that hearing.

We affirm both on the basis of Judge Blee's comprehensive opinion and based upon the retroactive application of N.J.S.A.

---

[14] Although not argued by the State, we have considered the Legislature's determination to make the statute effective seven months after enactment.   In determining a statute's retroactivity, its effective date is relevant to the first exception enunciated in Gibbons and not the analysis of whether the statute was ameliorative.   See Lombardo v. Revlon, Inc., 328 N.J. Super. 484, 490 (App. Div. 2000).   Further, the delay was likely necessitated by the Attorney General's need to prepare guidelines and the requirement that the JJC establish a program to gather and report data.   N.J.S.A. 2A:4A-26.1(c), (g).

2A:4A-26.1(c)(1), which precludes the waiver of juveniles who are less than fifteen years old at the time of the offense.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

**GILSON, J.S.C. t/a, concurring.**

I join in parts I and II of the majority's well-reasoned opinion. I do not join in part III because we need not address whether the age restriction in the recently revised <u>N.J.S.A.</u> 2A:4A-26.1(c)(1) applies retroactively.

As the majority noted, Judge Blee did not apply the revised statute, which became effective on March 1, 2016. Moreover, no party raised the retroactive application of <u>N.J.S.A.</u> 2A:4A-26.1(c)(1) on this appeal. Instead, this court raised the issue at oral argument and, thereafter, we directed supplemental briefing on that issue. Under these circumstances, the retroactive application of the age restriction in the revised statute was not, in my view, an alternative holding.

My decision not to join in part III of this opinion is based on the principle that courts should not reach issues that are not necessary to the resolution of a case and, thereby, run the risk of giving an advisory opinion. <u>See</u> <u>G.H. v. Twp. of Galloway</u>, 199 <u>N.J.</u> 135, 136 (2009) (declining to reach questions of limits to statutory preemption of municipal action in a challenge to the viability of existing ordinances). In that regard, our Supreme Court has consistently reasoned that "[t]he judicial function operates best when a concrete dispute is

presented to the courts." Ibid. Indeed, the Court has recently reminded us that we should not make rulings that are not necessary to the disposition of the appeal. See State v. J.M., Jr., _____ N.J. _____ (2016) (slip op. at 18, 21) (reversing the imposition of "a bright-line rule prohibiting the admission of acquitted-act evidence" when such a ruling was "not necessary," "had no bearing on the disposition of the appeal[,]" and "effectively rendered an advisory opinion").

Here, affirming Judge Blee's ruling completely resolves this appeal. The question of the retroactive application of the new statutory age requirement is neither necessary nor does it bear on the disposition of the appeal.

Moreover, as the majority correctly notes, there is no express language in the revised statute itself that addresses whether the Legislature intended the statute to be applied retroactively. See L. 2015, c. 89. Although the majority would apply the revised statute retroactively to this appeal, it does not clarify whether the revised statute applies in other circumstances. For example, does the revised statute apply to a case where the juvenile has already been waived to adult court and the trial is pending or has actually begun? Does the revised statute apply to a case where the juvenile was waived to adult court, was convicted, and is pending sentencing or appeal?

Posing those questions illustrates the wisdom of avoiding advisory opinions, which are not presented in a concrete dispute.

In sum, I would affirm on the basis of Judge Blee's comprehensive opinion, and I would not reach the retroactive application of <u>N.J.S.A.</u> 2A:4A-26.1(c)(1).

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0392-15T3