**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2001-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES C. ZARATE, a/k/a
NAVAJAS ZARATE,

     Defendant-Appellant.

_____

Argued telephonically March 23, 2020 –
Decided May 6, 2020

Before Judges Sabatino, Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 09-02-0262.

Alyssa A. Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alyssa A. Aiello, of counsel and on the briefs).

John K. McNamara, Jr., Chief Assistant Prosecutor, argued the cause for respondent (Fredric M. Knapp, Morris County Prosecutor, attorney; John K. McNamara, Jr., on the briefs).

Lawrence S. Lustberg argued the cause for amicus curiae the American Civil Liberties Union of New Jersey (Gibbons, PC, and American Civil Liberties Union New Jersey Foundation, attorneys; Lawrence S. Lustberg, Avram D. Frey and Alexander Shalom, on the brief).

Carol M. Henderson, Assistant Attorney General, argued the cause for amicus curiae the Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Carol M. Henderson, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

This appeal, along with the back-to-back appeals of State v. Ricky Zuber (A-2677-18), and State v. James Comer (A-1230-18) decided today, raises Eighth Amendment constitutional challenges to lengthy sentences imposed on juveniles tried as adults for very serious offenses.

Building upon prior decisions that struck down sentencing schemes that did not allow for consideration of the ways in which juvenile offenders differ from adult offenders, the United States Supreme Court in Miller v. Alabama, 567 U.S. 460 (2012), declared unconstitutional under the Eighth Amendment mandatory life imprisonment without parole for a juvenile sentenced as an adult.

Our State Supreme Court in State v. Zuber, 227 N.J. 422 (2017), applied Miller to any sentence imposed on a juvenile-aged offender that was the

A-2001-17T3

functional equivalent of a life sentence without parole. The Court in Zuber required sentencing judges to consider the five factors set forth in Miller that distinguish juvenile offenders from adult offenders. Zuber also required sentencing judges to apply the guidelines in State v. Yarbough, 100 N.J. 627 (1985), on consecutive sentencing, with a "heightened" level of care whenever a juvenile faces a lengthy aggregate sentence. 227 N.J. at 450.

As for the present case, in July 2005 defendant James Zarate[1] committed several atrocious offenses as a minor, including the murder of a teenage girl, the mutilation of her dead body, and an attempt to discard a footlocker and bag containing her remains off a bridge into a river. Zarate was age fourteen at the time.

Pursuant to the juvenile waiver statute that was then in effect, Zarate was tried as an adult. A jury found him guilty of, among other things, murder, desecration of human remains, hindering apprehension, and illegal possession of a weapon.

The judge who presided over Zarate's trial sentenced him in 2009 to life imprisonment subject to an 85% parole disqualifier under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, plus consecutive nine-year and four-year

---

[1] We shall refer to defendant in this opinion as "Zarate" unless the context otherwise indicates his brother, co-defendant Jonathan Zarate.

terms, respectively, on desecration and weapons counts.

After a series of procedural events we will describe in more detail, in 2017 the State Supreme Court remanded Zarate's case to the trial court for resentencing, in light of its opinion in Zuber and for application of the constitutional Miller factors.

At that resentencing hearing in November 2017, the trial court found the Miller factors generally weighed against defendant, but it revised the life sentence to a custodial term of fifty years subject to the NERA parole disqualifier. The net impact of the resentencing was to reduce Zarate's first eligibility for parole after he serves about 43 years, when he will be approximately age 57. This appeal followed.

As a threshold matter, Zarate argues he is no longer subject to an adult sentence under Title 2C because the Legislature's 2015 revision of the juvenile waiver statute raising the minimum waiver age to fifteen applies retroactively to his case. He does not contest his adjudication of guilt, but requests that he now be resentenced by a judge in the Family Part, where the maximum term for the juvenile equivalent of murder is twenty years.

Alternatively, if we decline to adopt his retroactivity argument, Zarate contends the trial court in 2017 failed to correctly apply the Miller factors to him, and that he is entitled to be resentenced again.

4

For the reasons that follow, we affirm Zarate's present sentence. We do so without foreclosing his ability at some unspecified future time to move for a reduction of his sentence, if he demonstrates, through conduct and new evidence, a realistic likelihood for rehabilitation that would make the continued imposition of his full sentence violative of the Miller factors.

We reject Zarate's contention that he is entitled to the retroactive application of the 2015 amendment of the juvenile waiver statute, because his conviction was final, and his sentence was first imposed and he began to serve it many years before the amendment's effective date.

## I.

We have already described the gruesome factual background of this case in an unpublished decision we issued in 2012. State v. Zarate, No. A-0070-09 (App. Div. 2012). We incorporate here by reference that background, with the following brief summary.

On Friday July 29, 2005, Zarate went to visit for the weekend the home of his father and stepmother, where his older brother Jonathan and stepsiblings lived. (slip op. at 4). Initially, after Zarate's parents had separated, Zarate and Jonathan both lived with their father. Id. at 11. This changed in 2003 after Zarate, who was in "the same remedial classes at school" with J.P. (the sixteen-year-old murder victim) "teased and picked on" J.P. Ibid. J.P. lived with her

A-2001-17T3

parents next door to Zarate's father.  Id.  at 4.

After J.P.'s mother complained to the school and told Zarate to leave J.P. alone, she found her car window shattered from a brick.  Ibid.  Zarate was charged as a juvenile, but the complaint was later dismissed, and Zarate was forced to live with his mother.  Ibid.  He spent alternating weekends at his father's home.  Id. at 4.  J.P.'s mother testified that after Zarate moved to his mother's house, he did not bother J.P. again.  Ibid.

Two years after the move, on Sunday July 31, 2005, J.P.'s parents reported J.P. missing.  Id. at 4.  Later that day, police saw a jeep stopped at the side of a Passaic River bridge and Zarate, Jonathan, and V.B. attempting to throw a footlocker and two trash bags over the bridge.  Ibid.  Inside the footlocker police found part of J.P.'s body from her head to her knees.  Id. at 5.  One trash bag contained her lower legs, and the other contained a bandana, a T-shirt, sandals and blood-stained paper towels.  Ibid.

Zarate did not testify at trial, but according to his police statement, which was admitted into evidence, J.P. came to their father's house at Jonathan's request, and when she arrived, Zarate went to sleep in another room.  Id. at 12. He awoke when he heard "big thumps."  Ibid.  Jonathan told Zarate that he had hit J.P. with a doorstop, stabbed her, placed a bandana in her mouth to muffle her screams, and cut off her legs because they did not fit inside the footlocker.

6

Id. at 12-13. He asked Zarate to help place the footlocker inside their father's jeep to dispose of it. Id. at 12-13.

Initially, V.B. denied any role in the murder and attempt to conceal evidence. Id. at 12. He then claimed that he only helped the brothers attempt to dispose of the evidence. Ibid. Later, he said Jonathan had told him that Jonathan had killed J.P., and he made no mention of Zarate. Ibid. Eventually, V.B. said that Jonathan and Zarate admitted to killing J.P., Zarate by stabbing her, and Jonathan by punching her. Ibid.

According to the medical examiner, J.P. had been stabbed multiple times in the neck, legs, and hands. Id. at 6-7. She had been punched multiple times in the head and had been struck repeatedly in the back with an object, later identified as a metal pole. Id. at 6. The examiner believed that "at least two people" had attacked her and that she had attempted to fight off the person facing her while another person struck her from behind. Id. at 7-9. The cause of death was suffocation from vomit and blood, which resulted from a severe blow to the back. Id. at 8-9.

During a search of the bedroom Zarate and Jonathan shared, police found a metal pole and a knife inside the pocket of a pair of jeans. Id. at 6-7. Police found J.P.'s blood and Zarate's DNA on the jeans. Id. at 6-7, 21. They also found J.P.'s blood on the pole. Id. at 6. The medical examiner testified that the

blade of the knife was consistent with the stab wounds on J.P.'s body.  Id. at 7.

The State theorized that Zarate had a motive to kill J.P. as a result of the bullying incident two years earlier, which resulted in his relocation to his mother's house.  Id. at 11.

These events occurred when Zarate was ten days' shy of turning fifteen years of age.

In March 2009, a grand jury indicted Zarate on the following nine counts relating to the July 2005 homicide:

- first-degree murder, N.J.S.A. 2C:11-3(a)(1)(a)(2) (count one);

- third-degree possession of a weapon (a metal pole) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two);

- fourth-degree unlawful possession of a weapon (a metal pole), N.J.S.A. 2C:39-5(d) (count three);

- third-degree possession of a weapon (a knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count four);

- fourth-degree unlawful possession of a weapon (a knife), N.J.S.A. 2C:39-5(d) (count five);

- second-degree desecrating human remains, N.J.S.A. 2C:22-1(a)(1) (count six);

- third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (count seven);

- second-degree desecrating human remains, N.J.S.A. 2C:22-1(a)(1) (count eight); and

- third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (count nine).

Early in the case, the State filed a motion to waive jurisdiction to the Law Division, pursuant to the then-existing provisions in N.J.S.A. 2A:4A-26(a). The court granted the motion.

In a separate indictment, Zarate's brother Jonathan, who was age eighteen at the time of the murder, was charged with the same offenses, in addition to use of a juvenile to commit a crime. (slip op. at 3). Jonathan's sixteen-year-old friend, V.B., was also charged and pled guilty to an act of delinquency, which, if committed by an adult, would constitute attempt to dispose of the victim's body. Id. at 4, 11. A jury convicted Jonathan of all charges, and the court imposed upon him an aggregate sentence of life imprisonment plus twenty-four years. Id. at 3.

In June 2009, a jury convicted Zarate of all counts. At his July 31, 2009 sentencing hearing, the court imposed upon Zarate a term of life imprisonment on count one, subject to an 85% period of parole ineligibility, followed by five years of parole, pursuant to NERA. The court additionally imposed a four-year term on count four and a nine-year term on count eight, to run consecutively to the life sentence. It imposed the following terms to run concurrently with the life sentence: seven years on count six; five years on count seven; and five years

on count nine. The court merged counts two and three into count one, and count five into count four, and imposed applicable fees and penalties.

Zarate appealed his conviction and sentence. In an unpublished decision dated August 27, 2012, we affirmed the conviction but reversed the sentence on limited grounds, concluding that the trial court had erred in failing to merge count four (possession of a knife for an unlawful purpose) into count one (murder), and in failing to consider mitigating factor thirteen ("[t]he conduct of a youthful defendant was substantially influenced by another person more mature than defendant"). State v. Zarate, No. A-0070-09 (App. Div. Jan. 27, 2012) (slip op. at 36-39). The Supreme Court denied certification. State v. Zarate, 212 N.J. 460 (2012).

At the first resentencing hearing on January 17, 2014, the judge who had originally sentenced Zarate considered mitigating factor thirteen inapplicable. The judge also considered the attendant circumstances of youth set forth by the United States Supreme Court in Miller. The judge concluded that none of the Miller factors outweighed the reasons that supported life imprisonment. In recognition of certain positive steps Zarate had taken while incarcerated up to that point, namely, obtaining an education, maintaining a job, and exhibiting good behavior, the judge changed the count eight consecutive term to a

10

concurrent term. Consistent with this court's instruction, the judge also merged count four into count one. In all other respects, the sentence remained the same.

Zarate appealed his resentence. State v. Zarate, No. A-4090-13 (App. Div. Feb. 24, 2016). He argued that the trial court had: failed to adequately consider the Miller factors; erred in rejecting mitigating factor thirteen; failed to consider sufficiently his rehabilitative efforts while incarcerated; imposed an unconstitutional de facto life sentence; and imposed a sentence that was inconsistent with the sentencing scheme created by the newly enacted juvenile waiver statute, N.J.S.A. 2A:4A-26.1(c)(1) (effective March 1, 2016), which increased the offense age for which a juvenile may be tried as an adult from fourteen to fifteen. Id. at 7. In supplemental briefs, he claimed that he was entitled to resentencing in light of the recent decisions by this court in State v. Zuber, 442 N.J. Super. 611 (App. Div. 2015), which used life expectancy charts to determine whether a lengthy sentence was essentially an unconstitutional life sentence,[2] and Montgomery v. Louisiana, ___ U.S. ___, ___, 136 S. Ct. 718, 733-35 (2016), which held that Miller applied retroactively. Zarate, slip op. at 8. He further argued that a sentence, as applied to juveniles, above the thirty-year minimum for murder, was disproportionately cruel and unusual under the

---

[2] Zuber, 442 N.J. Super. at 627, rev'd in part, 227 N.J. 422, 429 (2017).

New Jersey Constitution. Ibid.

In an unpublished decision issued on March 21, 2016, we found that the trial court had not abused its discretion in rejecting mitigating factor thirteen, in failing to consider Zarate's rehabilitative efforts, and in considering the Miller factors. Id. at 20-27, 38-39. We remanded, however, because the life sentence with its parole disqualifiers did not afford Zarate a meaningful opportunity for life outside of prison, and thus constituted a de facto life-without-parole ("LWOP") sentence. Id. at 28.

Zarate and the State each requested certification. On February 7, 2017, the Court summarily remanded the matter for resentencing in light of its decision in Zuber, 227 N.J. at 450, issued the previous month. State v. Zarate, 229 N.J. 167 (2017).

In Zuber, the Supreme Court rejected our ruling that sentencing courts should use life expectancy tables in considering the real-time effect of a sentence. The Court held in Zuber that the federal and state constitutions prohibit the imposition of a de facto LWOP sentence in juvenile cases, except in the rare case where a juvenile is found to be incorrigible. Zuber, 227 N.J. at 429.

Prior to his second resentencing hearing, Zarate moved to disqualify the trial judge, which the court denied. Zarate unsuccessfully moved to vacate that

12

order, and it is not challenged on this appeal.

Zarate then moved to void, retroactively, certain consequences of his original waiver to adult court. He sought to transfer the sentencing aspects of the matter to the Family Part for imposition of a juvenile disposition, in light of the Legislature's 2015 repeal of N.J.S.A. 2A:4A-26, and enactment of N.J.S.A. 2A:4A-26.1 (the revised waiver statute). Zarate also moved to bar as cruel and unusual punishment his sentence in excess of thirty years' imprisonment.

In September 2017, the trial court denied Zarate's motion to void the waiver, finding no evidence that the Legislature intended N.J.S.A. 2A:4A-26.1 to apply retroactively to this case.

On November 8, 2017, the court held Zarate's second resentencing hearing. After essentially reiterating its previous findings on the Miller factors, the court revised Zarate's life sentence on the murder count to instead impose a term of fifty years' imprisonment on count one, subject to a NERA 85% period of parole ineligibility. The court merged counts two through four with count one, and count five with count four. It also imposed the following terms to run concurrently with the sentence on count one: seven years on count six; five years on count seven; nine years on count eight; and five years on count nine.

On November 14, 2017, the court entered the revised judgment of conviction, as well as an order denying Zarate's motion to bar as cruel and

unusual punishment a sentence in excess of thirty years' imprisonment.

The present appeal followed.  In his counsel's brief, Zarate advances the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S APPLICATION TO TRANSFER THE MATTER TO THE FAMILY PART FOR DISPOSITION IN ACCORDANCE WITH THE JUVENILE CODE.

A. The Legislature's Act Of Raising The Minimum Age For Waiver From Fourteen To Fifteen Was Clearly Intended To Be Ameliorative, As The Majority Found In State in Interest of J.F.

B. The Savings Statute Does Not Preclude Transfer Of The Matter To The Family Part For Disposition Under The Revised Waiver Statute.

i. The issue in State v. Chambers.

ii. The history of savings statutes and their applicability to ameliorative changes in the law.

iii. The meaning of the term "penalty incurred."

iv. As State v. Parks makes clear, when a case is remanded for resentencing, a penalty is not incurred until the resentencing takes place.

14

C.      Transfer Of Jurisdiction To The Family Part Would Not Void Defendant's Adjudication Of Guilt.

POINT II

THE LENGTHY PRISON SENTENCE THAT DEFENDANT RECEIVED -- FIFTY YEARS SUBJECT TO THE NO EARLY RELEASE ACT -- FOR AN OFFENSE HE COMMITTED WHEN HE WAS FOURTEEN YEARS OLD VIOLATES THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT CONTAINED IN THE NEW JERSEY CONSTITUTION. ADDITIONALLY, IN LIGHT OF THE 2016 REVISION TO THE WAIVER STATUTE, WHICH RAISED THE MINIMUM AGE FOR WAIVER TO FIFTEEN, FUNDAMENTAL FAIRNESS REQUIRES THAT DEFENDANT'S SENTENCE BE REDUCED TO THE THIRTY-YEAR MINIMUM TERM REQUIRED UNDER N.J.S.A. 2C:11-3(b)(1).

POINT III

THE 50-YEAR SENTENCE THAT DEFENDANT RECEIVED DID NOT COMPORT WITH THE REQUIREMENTS OF STATE V. ZUBER.

A.      Introduction.

B.      The Requirements Of Zuber.

C.      The Imposition Of A Lengthy Prison Sentence Was Precluded By The Judge's Finding That Defendant Was Not Permanently Incorrigible Fundamentally Flawed Analysis Of The Miller Factors Led To The Erroneous Imposition Of A Lengthy Prison Sentence.

15

i. The Defense was not required to submit brain science evidence.

ii. The judge's findings regarding the <u>Miller</u> youth factors and mitigating factor 13.

iii. The judge committed an error in logic by relying on James' maturity and intelligence at age 19 as a basis to conclude that Defendant, at age 14, was not vulnerable to the negative influence of his 18-year old brother.

iv. The judge's conclusion that the offense was part of Defendant's plan to get revenge was unsupported by evidence and contrary to facts that are not in dispute.

In a pro se supplemental brief, Zarate raises the following issues:

SUPPLEMENTAL POINT I

THE TRANSFER OF JURISDICTION TO THE FAMILY PART FOR SENTENCING UNDER THE JUVENILE CODE IS NOT PRECLUDED UNDER THE SAVINGS STATUTE OR A RETROACTIVITY ANALYSIS.

A. The Attorney General's Attempt To Distinguish <u>State v. Parks</u> Is Unpersuasive.

B. There Is No Question That The Provision Of The Revised Statute Raising The Minimum Age For Waiver, Under Which All 14-Year-Olds Are Now Insulated From

16

The Severity Of Adult Sentencing, Is Ameliorative. Indeed, The First Case To Use The Term "Ameliorative" In A Retroactivity Analysis Did So In The Context Of A Statutory Amendment That Raised The Age At Which A Juvenile Charged With Murder Could Be Prosecuted As An Adult. Moreover, In Light Of The Vast Difference In Severity Between A Criminal Code Sentence Meant For An Adult And A Juvenile Code Sentence Focused On Rehabilitation, There Is Also No Question That Even Those Provisions That Merely Reduce The Possibility Of Adult Sentencing Are Also Ameliorative.

C.    The Fact That Zarate Has Already Been Waived, Tried And Convicted Does Not Bear On Whether The Revised Waiver Statute Applies To Him; It Bears Only On How The Revised Statute Applies To Him.

We granted the American Civil Liberties Union of New Jersey ("ACLU") and the Attorney General leave to participate as amicus curiae.[3]

## II.

As a threshold question, we first consider Zarate's argument that the amended juvenile waiver statute retroactively entitles him to be adjudicated now as a minor rather than resentenced as an adult, because he was the age of fourteen

---

[3] We are grateful for the thoughtful arguments of amici in this case and the other back-to-back cases.

when he committed these offenses. We disagree.

In approaching this issue, we recognize that our State Supreme Court on March 3, 2020 recently heard oral argument in State v. J.V., No. A-0095-18, a case that presents related retroactivity issues concerning the statutory amendment. We anticipate that the Court's forthcoming decision in J.V.—which coincidentally involves some of the same attorneys who argued the present appeal—may well control or affect the retroactivity issue here. Consequently, we bear in mind that forthcoming anticipated guidance in our own discussion of the issue.

A.

Under the former version of the waiver statute, N.J.S.A. 2A:4A-26 (repealed by L. 2015. c. 89), the Family Part had authority to waive jurisdiction over a juvenile age fourteen or older at the time of the offense, without the juvenile's consent, upon a motion by the State filed within thirty days of receipt of the complaint. N.J.S.A. 2A:4A-26(a)(1) and (d). The thirty days could be expanded for good cause. N.J.S.A. 2A:4A-26(d).

In support of such a motion, the State had to establish probable cause to believe the juvenile committed one of the offenses, or types of offenses, set forth in subsections N.J.S.A. 2A:4A-26(a)(2)(a) through (j), and that "the nature and circumstances of the charge or the prior record of the juvenile [were] sufficiently

18

serious that the interests of the public require[d] waiver." N.J.S.A. 2A:4A-26(a)(3). However, if the juvenile was charged with an offense enumerated in N.J.S.A. 2A:4A-26(a)(3), then the State did not have to establish that the charge or the juvenile's prior record were sufficiently serious to justify waiver. N.J.S.A. 2A:4A-26(a)(3).

The juvenile could defeat a waiver motion by establishing that the "probability of his rehabilitation" by age nineteen "substantially outweigh[ed] the reasons for waiver." N.J.S.A. 2A:4A-26(e). However, this provision was not available to a juvenile who was sixteen or older at the time of the offense and was charged with one of the offenses enumerated in N.J.S.A. 2A:4A-26(e), which were commonly called "Chart One offenses." Senate Law and Public Safety Committee Statement to S. 2003 (March 12, 2015) (hereinafter "March 12, 2015, Committee Statement"). Juveniles within this category were subject to "automatic waiver" upon application by the State. March 12, 2015, Committee Statement. A juvenile age fourteen or fifteen had the ability to defeat a waiver motion, regardless of whether the State charged a Chart One offense, or one of the less serious Chart Two offenses. N.J.S.A. 2A:4A-26(e); March 12, 2015, Committee Statement. Once waived to adult court, N.J.S.A. 2A:4A-26 contained no provisions for a remand back to the Family Part.

19

N.J.S.A. 2A:4A-26.1 made a number of changes to the waiver process. The first change is that the revised statute increases the minimum age at which a juvenile may be waived, from fourteen to fifteen, as of the date of the offense. N.J.S.A. 2A:4A-26.1(c)(1). Second, it extends the time in which the State may file a waiver motion from thirty to sixty days after receipt of the complaint. N.J.S.A. 2A:4A-26.1(a). Third, it reduces and more clearly defines the number of offenses that make a juvenile eligible for waiver and eliminates the distinction between Chart One and Two offenses. N.J.S.A. 2A:4A-26.1(c)(2)(a) to (o).

Fourth, the revised statute clarifies the State's burden in seeking waiver. Under the revised statute, the State must consider the factors listed in N.J.S.A. 2A:4A-26.1(c)(3)(a) to (k) prior to filling a waiver motion, and must provide "a written statement of reasons clearly setting forth the facts used in assessing" the factors, "together with an explanation as to how evaluation of those facts support waiver for each particular juvenile." N.J.S.A. 2A:4A-26.1(a). The court may deny the motion "if it is clearly convinced that the prosecutor abused his discretion in considering" the factors. N.J.S.A. 2A:4A-26.1(c)(3).

Fifth, the revised statute adds two provisions regarding remand from the Law Division to the Family Part. The first provision, N.J.S.A. 2A:4A-26.1(f)(2), requires the Law Division to remand to the Family Part if the juvenile is not convicted in the Law Division of a crime that made the juvenile eligible

for waiver.   If the juvenile was convicted of any non-waiver-eligible offense, then the conviction "shall be deemed a juvenile adjudication and be remanded to the . . . Family Part for disposition, in accordance with the dispositional options available to that court."   N.J.S.A.  2A:4A-26.1(f)(2).   The second provision, N.J.S.A. 2A:4A-26.1(f)(3), allows the Law Division, with the consent of both parties, to remand to the Family Part "if it appears that: (a) the interests of the public and the best interests of the juvenile require access to programs or procedures uniquely available to that court; and (b) the interests of the public are no longer served by waiver." N.J.S.A. 2A:4A-26.1(f)(3).

The sixth change provides a presumption that all juveniles, convicted of both waiver-eligible and non-waiver-eligible offenses, "shall serve any custodial sentence imposed in a State juvenile facility operated by the Juvenile Justice Commission" (JCC) until age twenty-one.  N.J.S.A. 2A:4A-26.1(f)(1).[4]

---

[4]     The amended statute includes two exceptions, neither of which concerns us here. N.J.S.A.  2A:4A-26.1(f)(1)(a) and (b).  The first exception allows for transfer to an adult prison if the juvenile has reached age eighteen and, in the discretion of the JCC, the juvenile's "continued presence in the juvenile facility threatens the public safety, the safety of juvenile offenders, or the ability of the commission to operate the program in the manner intended." N.J.S.A. 52:17B-175(e) (incorporated into the (f)(1)(a) exception).  In this situation, N.J.S.A. 52:17B-175(e)(1) to (5) requires the juvenile to be afforded counsel as well as notice and an opportunity to be heard prior to a final decision on transfer.
    The second exception allows a juvenile age twenty-one or older to remain in a juvenile facility in the discretion of the JCC and with the juvenile's consent.

The final change the revised statute makes to the waiver process is that it requires the JCC, in consultation with the Attorney General, to establish a program to collect and analyze data regarding, but not limited to:  demographic information of those waived to adult court; case characteristics, including offenses charged and final resolution; case processing times; and waiver rates by race and ethnicity.  N.J.S.A. 2A:4A-26.1(g)(1) (a) to (d).   This information must be published biennially and "transmit[ed] to the Governor and the Legislature . . . along with any recommendations . . . for legislation concerning waiver of jurisdiction of juvenile delinquency cases."   N.J.S.A. 2A:4A-26.1(g)(3).[5]

## B.

When the Legislature enacts a new law, there is a presumption that it will

---

N.J.S.A. 2A:4A-26.1(f)(1)(a) and (b).  This exception contains no limit on the duration of service in a juvenile facility past the age of twenty-one.

[5] To date, one such report has been published.  See State of New Jersey, Office of the Attorney General, Juvenile Justice Commission, Juvenile Waiver Practice in New Jersey An Analysis of Waivers Requested, Waivers Granted, and Waiver Cases Resolved in Criminal Court in 2016-2017 (July 2019), https://www.nj.gov/oag/jjc/2019-1011_Waiver_Report_2016-2017.pdf.   With respect to waiver of fourteen-year-old offenders, the report provides that from 2016 to 2017, three juveniles who were age fourteen at the time of the offense were waived to adult court.  Id. at 22.  "[F]or 1 youth the case was filed in juvenile court prior to the new [waiver] law, and for all 3 youth the offense itself occurred prior to the new law.  At the time the waiver was granted, these youth were aged 16, 18 and 21."  Ibid.  The report contains no additional information regarding these fourteen-year-old waived offenders.

apply prospectively only. State in the Interest of J.F., 446 N.J. Super. 39, 53 (App. Div. 2016). However, that presumption "can be overcome by an indication of contrary legislative intent, either expressed in the language of the statute itself, or implied in its purpose." Ibid. (quoting State v. Bey, 112 N.J. 45, 103 (1988)).

J.F., 446 N.J. Super. at 53, explains the test as follows:

> Courts must apply a two-part test to determine whether a statute should be applied retroactively: (1) whether the Legislature intended to give the statute retroactive application; and [if so] (2) whether retroactive application 'will result in either an unconstitutional interference with vested rights or a manifest injustice.'
>
> [Ardan v. Bd. of Review, 444 N.J. Super. 576, 587 (App. Div. 2016) (quoting James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014)).]

"A law is retrospective if it 'appl[ies] to events occurring before its enactment' or 'if it changes the legal consequences of acts completed before its effective date.'" Riley v. N.J. State Parole Bd., 219 N.J. 270, 285 (2014) (quoting Miller v. Florida, 482 U.S. 423, 430 (1987)).[6]

In deciphering legislative intent (the first part of the retroactive analysis

---

[6] In deciding whether a new rule of law issued by a court is entitled to retroactive application, our courts apply a test similar to the one applicable to new statutes. See State v. Knight, 145 N.J. 233, 251 (1996). See also comment 5 to R. 1:36-3.

test), a court "look[s] first to the statute's plain language." In the Matter of T.B., 236 N.J. 262, 274 (2019) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)).  The court reviews "'the entire statute' and read[s] all provisions 'together in light of the general intent of the act.'" Ibid. (quoting Perez v. Zagami, LLC, 218 N.J. 202, 211 (2014), and Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 195 (2010)).

Subject to the "savings statute" we will discuss, infra, courts generally will find legislative intent to apply a criminal statute retroactively when the statute is "ameliorative or curative" and aimed at remedying an undue harshness in punishment.  Id. at 54.  See also Application of Smigelski, 30 N.J. 513, 527 (1959) (allowing for retroactive application of an ameliorative juvenile commitment statute).

With respect to the second part of the retroactive application test (whether retroactive application will result in an unconstitutional interference with vested rights or a manifest injustice), the court "focuses on 'whether the parties relied on prior law to their detriment, such that retroactive application would cause a deleterious and irrevocable result.'" Ardan, 444 N.J. Super. at 587 (quoting James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 556 (2014), and Innes v. Innes, 117 N.J. 496, 511 (1990)).  The manifest injustice standard is an equitable one that includes, but is not limited to, consideration of constitutional rights.  Nobrega

24

v. Edison Glen Assocs., 167 N.J. 520, 545 (2001). It requires a weighing of the "public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance." Ardan, 444 N.J. Super. at 589 (quoting Oberhand v. N.J. Dir., Div. of Taxation, 193 N.J. 558, 572 (2008) and Nelson v. Bd. of Educ., 148 N.J. 358, 372 (1997)).

In reviewing a trial court's decision on the retroactive effect of a law, an appellate court reviews the decision de novo, as the issue is a matter of law, not entitled to any deference. In the Matter of Registrant G.H., 455 N.J. Super. 515, 526 (App. Div. 2018), aff'd and remanded, 240 N.J. 113 (2019).

### C.

Here, the trial court at the second resentencing declined to give N.J.S.A. 2A:4A-26.1 retroactive effect. The court found no expressed or implied legislative intent to support that position. The court noted that the law's effective date, which was seven months after passage, suggested a contrary intention to have the law apply prospectively only.

We agree with the State's position that Zarate is not entitled to the retroactive benefit of the amended statute, essentially for three reasons: (1) the impact of the "savings statute," N.J.S.A. 1:1-15; (2) the Legislature's decision to adopt an effective date for the statute of seven months after its enactment; and (3) the strong unlikelihood that the Legislature intended the 2015 amendment to

25

upset an adult conviction from 2009 arising out of offenses that occurred in 2005.

First, we consider the savings statute. That law codifies the "general prohibition against retroactive application of penal laws." State v. Chambers, 377 N.J. Super. 365, 367 (App. Div. 2005). The statute provides:

> No offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred, previous to the time of the repeal or alteration of any act or part of any act, by the enactment of the Revised Statutes or by any act heretofore or hereafter enacted, shall be discharged, released or affected by the repeal or alteration of the statute under which such offense, liability, penalty or forfeiture was incurred, unless it is expressly declared in the act by which such repeal or alteration is effectuated, that an offense, liability, penalty or forfeiture already committed or incurred shall be thereby discharged, released or affected; and indictments, prosecutions and actions for such offenses, liabilities, penalties or forfeitures already committed or incurred shall be commenced or continued and be proceeded with in all respects as if the act or part of an act had not been repealed or altered, except that when the Revised Statutes, or other act by which such repeal or alteration is effectuated, shall relate to mere matters of practice or mode of procedure, the proceedings had thereafter on the indictment or in the prosecution for such offenses, liabilities, penalties or forfeitures shall be in such respects, as far as is practicable, in accordance with the provisions of the Revised Statutes or such subsequent act.
>
> [N.J.S.A. 1:1-15 (emphasis added).]

None of the three published decisions that discuss the savings statute's

application to a penal law precisely deal with the circumstances before us. See State v. Parks, 192 N.J. 483 (2007); State in the Interest of C.F., 444 N.J. Super. 179 (App. Div. 2016); and Chambers, 377 N.J. Super. at 365. However, those cases do find importance in determining, under the words of the savings statute, when a defendant's "penalty" was "incurred." If the penalty was incurred before the penal statute was newly adopted or amended, then the savings provision makes the new law retroactively inapplicable.

In Chambers, we ruled that an amended DWI statute was not entitled to retroactive application because the statute was not ameliorative, and the defendant driver had "incurred" the penalty under the former version of the statute when the municipal court sentenced him, prior to the amendment's effective date. 377 N.J. Super. at 372; 374-75. In C.F., we underscored that the savings statute makes a distinction between when an offense occurs and when a penalty is incurred. Id. at 188-89. "[W]e look to the date an offense was committed in determining whether a new law, which discharges, releases or affects an offense, should be applied to that offense," but we look "to the date a penalty was incurred to determine whether a new law should discharge, release or affect the penalty for the offense." Id. at 188-89. Finally, in Parks, the Supreme Court focused on when a defendant's sentence had been "incurred" and concluded that, for purposes of the new Three Strikes sentencing law, the

sentence had not yet been incurred because his original sentence had been "nullified" and remanded. Parks, 192 N.J. at 488.

We are unpersuaded by the defense's contention that Zarate did not "incur" a penalty in 2009 when the trial court first imposed its sentence upon him. Pursuant to the judgment of conviction, Zarate was in custody and was already serving his sentence for many years before the 2015 amendment to the waiver statute. The sentence was not stayed.

The happenstance that this court had remanded the matter to the trial court several times to reconsider discrete facets of the sentence does not change the simple fact that a sentence already had been imposed. We reject Zarate's argument that his sentence still has not yet been incurred because, due to litigation, its final contours have not been confirmed or modified.

Second, we agree with the State and the trial court that the Legislature's selection of an effective date for the statute seven months after its passage is a strong indicator of an intent to not apply it to defendants who were adjudicated before or during that seven-month transition period. The cutoff was surely deliberate, and fashioned to give prosecutors, defense lawyers, juvenile officials, corrections administrators, and judges ample time to prepare for the new law's implementation. Zarate should be treated no better than a juvenile who was sentenced as an adult during that seven-month interval before the new

28

law became effective.

Third, we are unpersuaded that the Legislature intended to have a person such as Zarate receive the benefit of the amended waiver law years after he was found guilty of an adult offense by a jury. Zarate seeks a peculiar partial application of the new law: he wants to have his adult conviction in the Criminal Part left intact, but now be sentenced on those adult crimes as a former juvenile by a Family Part judge. We doubt the Legislature intended to allow defendants to pick and choose which parts of the amended waiver statute they prefer to use. Instead, the statute is an integrated, comprehensive scheme.

We do agree with the defense and the ACLU that the new juvenile provisions, as a whole, can fairly be said to have "ameliorative" aspects in raising the minimum age for juvenile waiver from fourteen to fifteen in changing past practices. Our two-member majority in J.F., 446 N.J. Super. at 53, recognized those ameliorative characteristics. However, the reforms do not necessarily mean the Legislature was concerned about making retroactive alterations to sentences that had been previously imposed years ago on prisoners like Zarate, who are now grown men and women.

In sum, we affirm the trial court's denial of Zarate's request to be resentenced in the Family Part and to have his custodial term for murder limited to twenty years.

A-2001-17T3

## III.

Zarate's other major argument is that the trial court misapplied the <u>Miller</u> factors at his second resentencing, and that his case should be remanded once again to enable the court to reassess those factors. We discern no necessity for such a remand.

The five <u>Miller</u> factors, as itemized by our Supreme Court's opinion in <u>Zuber</u>, are as follows:

> Mandatory life without parole for a juvenile convicted of homicide
>
> [1] precludes consideration of [the juvenile's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.
>
> [2] It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.
>
> [3] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.
>
> [4] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

> [5] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.
>
> [Zuber, 227 N.J. at 445 (quoting Miller, 567 U.S. at 477).]

The Zuber Court found the foregoing Miller factors applicable in all cases where a juvenile faces a lengthy term of incarceration that is the practical equivalent of life imprisonment, regardless of the crime committed. Ibid.

Here, we will assume, without deciding, that Zarate's present 50-year NERA sentence constitutes the functional equivalent of an LWOP sentence, and that the Miller factors pertain. Even under that premise, we are not persuaded that the sentencing judge's analysis misapplied those factors in a manner that requires yet another remand.

## A.

As a general matter, our courts afford substantial deference to trial courts on sentencing matters. Ordinarily we will not second-guess a judge's calibration of a sentence unless the judge failed to follow the sentencing guidelines, the aggravating and mitigating factors were not supported by the evidence, or application of the guidelines renders the sentence clearly unreasonable. State v. Roth, 95 N.J. 334, 364-65 (1984). The goal in imposing sentence is to qualitatively weigh the aggravating and mitigating factors set forth in N.J.S.A.

2C:44-1(a) and (b) "to insure that sentencing is individualized without being arbitrary." State v. Sainz, 107 N.J. 283, 288 (1987). Our case law repeatedly acknowledges the high degree of deference we should afford to such sentencing determinations. See State v. Case, 220 N.J. 49, 65 (2014) (explaining appellate courts' deferential standard of review of sentencing when the trial judge follows the Code and the basic precepts that channel sentencing discretion); State v. Fuentes, 217 N.J. 57, 70 (2014) (noting appellate courts review sentencing determinations in accordance with a deferential standard); State v. Bieniek, 200 N.J. 601, 608 (2010) (noting that when the trial court follows "the sentencing principles set forth in the Code and defined in our case law, its discretion should be immune from second-guessing.").

The sentencing judge addressed the Miller factors on two separate occasions: first at the resentencing in 2014 and again at the second resentencing in 2017.

At the first resentencing, as to Miller factor one (the juvenile's lack of maturity and undeveloped sense of responsibility leading to reckless behavior), the judge found the factor had limited significance, explaining that this crime "is much more than recklessness, and there's no impulsivity when you are removing a body on the second day after" the victim has been killed.

The judge rejected the notion that Zarate was irresponsible and influenced by his older brother Jonathan, finding instead that Zarate was "a manipulator and not the one being manipulated." Zarate portrayed himself as "bright and intelligent." He received above average grades, and no evidence was presented that he suffered from any abnormal brain development. He also suffered from no mental illness or from drug and alcohol use. At his initial sentencing, he had "read a well-organized and intelligent allocution," quoting a German philosopher.

The judge acknowledged a report from Dr. Raul, Zarate's aunt who was a practicing psychiatrist in California, which explained the scientific literature regarding brain development of juveniles and how that literature had impacted the Supreme Court's understanding of youth and crime. She believed that her nephew fell within the typical class of juveniles who were less culpable and capable of reform. She also explained that defendant had been diagnosed with attention deficit hyperactivity disorder as a child, but his parents chose to not treat him with medication. The court gave little or no weight to her letter because no evidence established that Zarate suffered from a psychotic disorder.

The court also considered a report by Dr. Martin Weinapple, who had evaluated Zarate in relation to the waiver motion, as well as a report by Dr. Shriver, who had evaluated Zarate in the ninth grade after Zarate had pulled a

knife on someone but did not intend to use it. In reference to the bullying incident, Zarate told Dr. Weinapple that "there had been some trouble" between himself and J.P., which resulted in his having to stay trouble-free for three months. The court underscored that Zarate "doesn't even admit that he did something wrong." Further, the court said that neither of the doctor reports discussed any evidence of psychosis, dysfunctional thought process, or drug and alcohol dependency. Thus, the court did not afford much, if any, weight to the reports.

According to the court, Zarate, and not Jonathan, had a motive to kill J.P. to seek revenge for complaining about his bullying. While the court said that some evidence suggested that J.P. "was somewhat enamored by" Jonathan, "which may have been what motivated her to go to" the house when Jonathan invited her, the court nonetheless found that Zarate had lured her to the home by manipulating Jonathan. Thus, the court found that Miller factor one, as well as mitigating sentencing factor thirteen, were not applicable to this case.

The court found that Miller factor two (family and home environment) were also inapplicable because Zarate came from a "loving, caring, close knit family" that attended church every Sunday. The court mentioned a statement that Zarate had provided, claiming that he had looked up to his brother and that his brother had cared for him like a father after the divorce while their

34

stepmother starved and physically abused them. However, the court said that no other evidence substantiated Zarate's claim that his stepmother had abused them. Further, Zarate had reported to Dr. Weinapple that he had a "decent relationship with his stepmother and stepsiblings."

With respect to Zarate's relationship with Jonathan, the court said that Zarate had spoken "fondly" of Jonathan to Dr. Weinapple. The court continued: "Then with all this love for his brother, [Zarate] described how this brutal, savage and heinous act was committed by that same brother done while Zarate claims he slept on a couch, only to be awakened to help with the trunk. He's not believable and he's without remorse."

On Miller factor three (extent of defendant's participation in the crime and the way familial and peer pressures may have affected him) the court found that Zarate was "an active and willing participant in a savage, tortuous killing." He showed "no emotion, remorse, compassion [or] mercy for what can only be described as a brutal, heinous, unfathomable slaughter."

On Miller factor four (inability to deal with police officers, prosecutors, and his own counsel) the court found that it too was not applicable because Zarate had directed his attorney to file certain motions and to enter a stipulation notifying the jury that Jonathan had committed the murder alone and had already been tried. He also submitted as evidence his police statement denying

35

participation in the murder.

Finally, on <u>Miller</u> factor five (possibility of rehabilitation), the court did not make a specific finding on whether it believed Zarate was capable of rehabilitation. However, in recognition of the rehabilitative steps Zarate had taken up that point in prison (i.e., maintaining a job, obtaining an education and exhibiting good behavior), the court decided to impose no consecutive term.

As noted, Zarate appealed, and we remanded, finding that the court had imposed an unconstitutional de facto life sentence that constituted cruel and unusual punishment. <u>Zarate</u>, slip op. at 9. In relation to the sentencing court's findings on the <u>Miller</u> factors, we wrote:

> We disagree with defendant's contention that the judge failed to take into account general principles that minor offenders tend to be immature and to lack a fully-formed capacity to consider the consequences of their wrongful acts. The judge appropriately focused on defendant's own individual attributes, including his relative level of intelligence and other personal characteristics indicative of his capacity to appreciate the wrongfulness of his actions and to bear responsibility for them.
>
> Although the judge did not discuss all of the various passages from <u>Miller</u> now cited by defendant on appeal as a "five-factor test," he took those youth-related concepts collectively into consideration in exercising his sentencing discretion. The judge did not give lip service to those concepts. In fact, the judge eliminated the thirteen-year consecutive term imposed in the original sentence, in recognition of defendant's post-

36

conviction efforts toward rehabilitation, which reflects the judge's recognition of the potential capacity of this young defendant to reform as an adult.

[Id. at 26-27.]

The Supreme Court granted certification and also remanded in light of its Zuber decision, which instructs sentencing courts to consider the Miller factors when imposing a lengthy sentence on a juvenile, and which rejects the notion that the court should use life expectancy tables to determine whether a sentence amounts to an unconstitutional de facto life term. Zarate, 229 N.J. at 167.

B.

At the second resentencing, the court made findings comparable to those it had made at the first resentencing. It found that Miller factor one (immaturity and failure to appreciate risk) had little weight because Zarate was intelligent and had influenced and manipulated Jonathan to help him commit the murder as revenge for J.P.'s bullying allegations. The court said that this crime involved "more than recklessness or impetuosity"; it was a heinous murder that included dismembering the body and attempting to dispose of the evidence the following day.

The court found that Zarate's intellectual abilities contradicted the notion that he had failed to appreciate risk and had acted impulsively. He had earned above average grades and had scored well on the SAT exam. In April 2011, he

had completed paralegal studies. At his first sentencing, he had given "a well-organized and intelligent allocution," quoting the German philosopher Friedrich Nietzsche. A report from Dr. Raul also claimed Zarate did not struggle with lack of intelligence.

Additionally, Doctors Raul, Shriver and Weinapple reported that Zarate showed no signs of psychological disorder. Dr. Raul spoke about the lack of judgment that juveniles have in general, but offered no proof specific to Zarate. Dr. Shriver, who had evaluated Zarate after he had pulled a knife on someone in ninth grade, believed that he was not a threat to anyone and showed no signs of abnormal brain functioning. Again, the court noted that while the doctor reports discussed the brain development of the juvenile brain in general, none discussed studies specific to Zarate. Thus, the court found that Zarate's intelligence, lack of psychological disorder or illness, and manipulation of Jonathan weighed against a finding that he had acted impulsively and had failed to appreciate risk.

On Miller factor two (family and home environment) the court found that Zarate did not come from a dysfunctional family. Rather, he came from a supportive, religious family who continued to support him. Zarate's minister described him as "intelligent, insightful, honest and deeply spiritual and a loyal young man."

On Miller factor three (extent of defendant's participation in the crime and

whether he was influenced or pressured by another) the court repeated that Zarate was intelligent and was not influenced or manipulated by anyone, but rather, that he had influenced Jonathan to commit the murder as revenge. The court underscored that Zarate had "participated extensively" in "this brutal, merciless slaying and dismembering."

On Miller factor four (ability to assist in one's defense and deal with law enforcement), the court found that Zarate was capable of assisting in his own defense, concluding: "He's not only assisting [his counsel], he's telling them" what to do. The court attributed to Zarate the decisions to stipulate that Zarate claimed Jonathan had acted alone in murdering J.P. and to admit as evidence Zarate's police statement denying involvement in the murder. The court found that both showed Zarate was "bright" and "cunning." Further, the court found that Zarate "was not in any way intimidated or overwhelmed by law enforcement. At all times he responded in such a way that showed he knew "how to deal with police officers."

On Miller factor five (ability to be rehabilitated), the court said that it did not find Zarate incorrigible and incapable of rehabilitation. Zarate had "taken some steps" to rehabilitate himself, for example, by receiving an education in prison and maintaining a job. However, the court said that those steps were offset to an extent by Zarate's failure to admit his participation in the murder

39

and by his lack of remorse.

Further, as a disturbing trend, the court noted Zarate had incurred seven infractions while incarcerated, one of which was for assaulting a corrections officer in 2016. His most recent infraction occurred in September 2017. He had been referred to segregation and for loss of commutation time and privileges, and the prison required that he be kept away from two other inmates. He had also failed to complete six classes that he had started, including an anger management class.

As it had before, the court found applicable aggravating sentencing factors one, two, three, and also nine, underscoring the need for specific deterrence. The court found no mitigating factors, but said that factor seven (lack of prior record) "arguably" applied because Zarate's record included juvenile matters that were handled through a diversion program. The court concluded that the aggravating factors substantially outweighed the mitigating factors.

As we have previously noted, the court imposed a revised sentence of 50 years' imprisonment on count one, subject to a mandatory 85% period of parole ineligibility and 5 years of parole supervision following release, pursuant to NERA. The court merged counts two through four with count one, and count five with count four and imposed the following terms to run concurrently with the sentence on count one: 7 years on count six; 5 years on count seven; 9 years

40

on count eight; and 5 years on count nine.

C.

Zarate and the ACLU contend that the court misapplied the Miller factors and failed to be guided by the premise that juveniles are constitutionally different from adults for purposes of sentencing.

In this regard, the ACLU highlights scientific studies that it says show: (1) the irresistibility of thrill seeking behavior for fourteen-year-olds based on "rapid and dramatic increase in dopaminergic activity within the socioemotional system," Laurence Steinberg, Elizabeth Cauffman, et al., Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model, 44 Dev. Psychol. 1764, 1764 (2008); (2) juveniles' poor impulse control and ability to foresee consequences based on incomplete development of the frontal lobes, Miller, 567 U.S. at 472 n.5; and (3) the "pruning process" that the adolescent brain undergoes, which promotes efficient responses "to the demands of the environment," Sara B. Johnson, et al., Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy, 45 J. Adolescent Health 216, 219 (2009). The ACLU underscores that these deficiencies in development establish that "juveniles are more likely to take 'impetuous and ill-considered actions,' and are 'overrepresented statistically in virtually every category of reckless behavior.'"

41

Zuber, 227 N.J. at 440; Roper, 543 U.S. at 569.

With respect to Miller factor one, Zarate and the ACLU argue that the court misinterpreted it as being applicable only when a juvenile submits proof of that juvenile's brain development, lack of maturity, and failure to appreciate risks. As the ACLU says, "developmental shortcomings of youth are categorical," as "no child is born with an adult brain." Roper, 543 U.S. at 569; Miller, 567 U.S. at 472 n.5. Thus, it asserts that a defendant need not present proof of his or her brain development in order for a sentencing court to afford Miller factor one significant weight.

Zarate also contends that even though he was not required to submit studies on his brain development, he did submit reports from Doctors Raul, Shriver and Weinapple, which showed that he fit within the model of children who have limited brain development and are susceptible to influence.

Zarate and the ACLU further argue that the court also improperly relied on Zarate's intellectual abilities and maturity, both of which developed over time and after the murder, to conclude that Miller factors one (failure to appreciate risks), three (influence by others), and four (ability to deal with attorneys and police) did not apply or had little weight.

The ACLU cites in this regard a meta-analysis of forty-two studies of over 5600 participants that "unequivocally" concluded intelligence and ego

development (i.e., "impulse control, perspective taking, [and] self-reflection") are "conceptually and functionally distinct concepts." Lawrence D. Cohn & P. Michiel Westenberg, Intelligence and Maturity: Meta-Analytic Evidence for the Incremental and Discriminant Validity of Loevinger's Measure of Ego Development, 86 J. of Personality & Social Psych. 760, 767 (2004).

Zarate also challenges as unsupported the court's finding that he was not substantially influenced by Jonathan, but rather that he had influenced and manipulated Jonathan to murder J.P. out of revenge. Zarate points out that Jonathan had invited J.P. to the house and contends that Jonathan, who had a history of assaultive behavior, had attacked her after they began arguing about Zarate. Moreover, he claims that Zarate and J.P. had no issues after Zarate moved to his mother's home two years before the murder.

Finally, Zarate and the ACLU argue that it was improper for the court to attribute trial strategy and evidence decisions to Zarate and to use that finding as a basis to negate Miller factor four. Zarate asserts that trial strategy is generally within the exclusive domain of attorneys and that the trial occurred four years after the murder when Zarate was age eighteen. Thus, his ability to assist his trial attorneys did not reflect his earlier abilities at age fourteen.

With respect to the length of his sentence, Zarate contends that a fifty-year term is essentially a life term, and that Graham and Miller preclude the

court from imposing a life term without a finding of incorrigibility. <u>Graham v. Florida</u>, 560 U.S. 48 (2011) (holding that sentencing a juvenile offender to life without parole for a non-homicide offense violates the Cruel and Unusual Punishment clause of the Eighth Amendment). Here, the court specifically found that Zarate was not incorrigible, yet it imposed a de facto life sentence. Zarate requests that in light of these alleged errors, we reduce his sentence at the very least to the minimum term for murder, which is thirty years' imprisonment without parole.

D.

These arguments by appellant and the ACLU have some probative force. We acknowledge, as did the Supreme Court in <u>Zuber</u>, the developing research and literature that teaches us that adolescent thinking processes often are not fully formed, and that there may be a variety of explanations as to why a teenager would engage in violent and inhumane behavior.

But appraising the merits of such developing literature and its scientific validity is not our task here as a reviewing court. Our task instead is to determine whether the sentencing judge—who happened in this instance to have presided over the trial—abused his discretion or lacked support in the record for his findings with respect to the <u>Miller</u> factors. Viewed through an appropriate prism of substantial deference, we cannot say that the judge's assessments are

44                                                                    <span>A-2001-17T3</span>

unfounded or untenable.

The judge was not obligated to adopt the views of the experts the defense tendered, including Zarate's aunt. See Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002) (citing Carey v. Lovett, 132 N.J. 44, 64 (1993)) (with respect to the opinions of qualified experts, a finder of fact is free to accept or reject the testimony of either side's expert, in full or in part). The judge had the prerogative to adopt his own reasoned interpretation of the trial evidence and post-trial proofs that had unfolded before him first-hand. It is not our place to second-guess the judge's assessment that Zarate, despite being the younger of the two brothers, was the one more culpable in carrying out this brutal execution of a girl he had personal reason to detest. Moreover, the judge's impressions of Zarate's intelligence have support in the record, and are not rendered meaningless by the cited research articles.

As we stated in the previous 2016 appeal, the judge's discussion of the Miller factors may not have been as precise or thorough as it could be, but his discussion clearly endeavored to take into account Zarate's youth. Indeed, that recognition of youth caused the judge to scale back even further the sentence he had previously imposed. We decline to reverse the judge's determinations and send this case back now for a third time. The judge did not abuse his sentencing discretion or disregard the applicable law.

E.

That said, we are mindful of the considerable remaining length of Zarate's 50-year NERA sentence, and the difficulties in forecasting, even now at the fifteen-year mark since the 2005 offenses, whether he will ever gain the capacity for rehabilitation. As the United States Supreme Court in Graham, 560 U.S. at 72-73, and our Supreme Court in Zuber, 227 N.J. at 444, aptly recognized, it is exceedingly hard to determine with assurance that a person who commits atrocious crimes as a minor is hopelessly incorrigible and will never be capable of reform and redemption.

Zuber instructed that few juveniles should receive de facto life terms because "it is only the 'rare juvenile offender whose crime reflects irreparable corruption.'" Id. at 451 (quoting Miller, 567 U.S. at 479 and Roper, 543 U.S. at 573). Zuber considered the issue in the following discussion:

> We recognize that, even when judges begin to use the Miller factors at sentencing, a small number of juveniles will receive lengthy sentences with substantial periods of parole ineligibility, particularly in cases that involve multiple offenses on different occasions or multiple victims. Imagine a sentence with a 50-year period of parole ineligibility imposed on a juvenile today. Decades from now, before he becomes eligible for parole, he might return to court to challenge the constitutionality of his sentence. He might ask the court to review factors that could not be fully assessed when he was originally sentenced—like whether he still

fails to appreciate risks and consequences, or whether he may be, or has been, rehabilitated.

[Id. at 451-52 (citing Miller, 567 U.S. at 477) (emphasis added).]

To address the issue and avoid a "potential constitutional challenge in the future," Zuber "encourage[d] the Legislature to examine this issue." Id. at 452. The Court said:

Graham left it to the States "to explore the means and mechanisms" to give defendants "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Graham, 560 U.S. at 75. Some legislatures have already acted.

We ask the Legislature to consider enacting a scheme that provides for later review of juvenile sentences with lengthy periods of parole ineligibility, and to consider whether defendants should be entitled to appointed counsel at that hearing. To the extent the parties and amici urge this Court to impose a maximum limit on parole ineligibility for juveniles of thirty years, we defer to the Legislature on that question.

[Ibid. (emphasis added).]

The Legislature has considered this very issue, but has not yet enacted any law on point. See A. 1233 (2018) (a bill which would allow a juvenile sentenced to twenty years or more without parole to petition for resentencing ten years after conviction and to be eligible for parole after twenty years of incarceration); S. 3079 (2017), reintroduced as, S. 428 (2018) (allowing a juvenile sentenced to

thirty years or more without parole to petition for review of the sentence after thirty years of incarceration if convicted of murder and twenty years for all other crimes).

In the absence of legislative action to date, we decline to foreclose, as the Court suggested in Zuber, the possibility that Zarate may in the future be able to "return to court" and demonstrate that he has sufficiently reformed himself to a degree that serving his original sentence in full no longer is constitutional under the Eighth Amendment. 227 N.J. at 451. Perhaps Rule 3:21-10 might furnish such a narrow pathway for future relief, although we decline to hold in the abstract whether that Rule would apply.

We do not decide here what would be an appropriate amount of time in prison to elapse to justify such motions. The parties and the amici have made various systemic suggestions in that regard, none of which we endorse or reject. Ideally, as the Court in Zuber suggested, this is a topic for legislative consideration. Meanwhile, given Zarate's alarmingly poor conduct in prison over the past few years, we perceive no grounds for him to pursue such an application in the near future.

For these many reasons, we affirm Zarate's modified sentence, without prejudice to the possibility of a future application for relief.

All other arguments raised on appeal lack sufficient merit to warrant

48

discussion.  <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2001-17T3